# NATIONAL LABOR RELATIONS BOARD *v.* SAVAIR MANUFACTURING CO.

No. 72–1231.   Argued November 12, 1973—
Decided December 17, 1973

Douglas, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Marshall, Powell, and Rehnquist, JJ., joined. White, J., filed a dissenting opinion, in which Brennan and Blackmun, JJ., joined, *post,* p. 281.

*Norton J. Come* argued the cause for petitioner. With him on the brief were *Solicitor General Bork, Samuel Huntington, Peter G. Nash, John S. Irving, Patrick Hardin,* and *Linda Sher.*

*Robert J. Solner* argued the cause and filed a brief for respondent.

Mr. Justice Douglas delivered the opinion of the Court.

The National Labor Relations Board, acting pursuant to § 9 (c) of the National Labor Relations Act, as

amended, 61 Stat. 144,[1] 29 U. S. C. § 159 (c), conducted an election by secret ballot among the production and maintenance employees of respondent at the request of the Mechanics Educational Society of America (hereafter Union). Under the Act [2] the Union, if it wins the election, becomes "the exclusive representative of all the employees" in that particular unit for purposes of collective bargaining. The Union won the election by a vote of 22–20.

Respondent filed objections to the election, but after an evidentiary hearing, a hearing officer found against respondent and the Board certified the Union as the representative of the employees in that unit. Respondent, however, refused to bargain. The Union thereupon filed

---

[1] Section 9 (c) (1) (A) provides in part:

"(c) (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

"(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in [§ 9 (a)] . . .

.        .        .        .        .

"the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. . . . If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof." 29 U. S. C. § 159 (c).

[2] Section 9 (a) provides:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 29 U. S. C. § 159 (a).

an unfair labor practice charge with the General Counsel, who issued a complaint alleging that respondent had violated §§ 8 (a)(1) and (5) of the Act.[3] The Board sustained the allegations and ordered respondent to bargain with the Union. 194 N. L. R. B. 298. The Court of Appeals denied enforcement of the order. 470 F. 2d 305. We granted the petition for certiorari, 411 U. S. 964, there apparently being a conflict between this decision in the Sixth Circuit and a decision in the Eighth Circuit, *NLRB* v. *DIT–MCO, Inc.,* 428 F. 2d 775, and also with one in the Ninth Circuit, *NLRB* v. *G. K. Turner Associates,* 457 F. 2d 484. We affirm.

It appeared that prior to the election, "recognition slips" were circulated among employees. An employee who signed the slip before the election[4] became a mem-

---

[3] Sections 8 (a)(1) and (5) provide:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7];

.　　　.　　　.　　　.　　　.

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section [9 (a)]." 29 U. S. C. §§ 158 (a)(1) and (5).

[4] The question for review presented by the Board is whether the "Board properly concluded that a union's offer to waive initiation fees for all employees who sign union authorization cards *before a Board representation election,* if the union wins the election, does not tend to interfere with employee free choice in the election." (Emphasis added.) There was testimony by Alfred Smith, National Secretary-Treasurer of the Union, that he told the employees at a meeting that the waiver of initiation fees was open to all who signed the authorization cards before the collective-bargaining contract was signed.

The Hearing Officer, however, found that

"Bridgeman further testified that subsequent to that meeting, and prior to the election, Bennie McKnight told employees that if they signed the union membership and authorization card *before the*

ber of the Union and would not have to pay what at times was called an "initiation fee" and at times a "fine." If the Union was voted in, those who had not signed a recognition slip would have to pay.

*election*, there would be no union 'initiation fee' if the union were successful at the election." (Emphasis added.)

While Bridgeman's testimony about McKnight's representations after the meeting might have been only implicit, the Hearing Officer also referred to Bridgeman's testimony that Smith himself had stated at the meeting that waiver of the initiation fee would be limited to those signing up before the election. The Hearing Officer clearly proceeded on the premise that the waiver was open only to those who signed up before the election:

"The Employer further argues that it is an economic inducement contingent upon how employees vote in the election and on the results of the election, and as such, constitutes an objectionable inducement. This argument, however, has been rejected by the Board. In the *DIT–MCO, Inc.*, 163 N. L. R. B. No. 147 case [p. 1019], the Board held that a provisional waiver of initiation fees prior to election is not improper regardless of whether it is contingent upon the results of the election. The Board pointed out that it would be unreasonable to conclude that a statement by the union during an election to the effect that an assessment of money or an obligation to pay money *which could be avoided by the execution of a union membership card prior to the election,* would influence a vote in favor of the Union when the simplest way to avoid the incurrence of any financial obligation would be to vote 'no.' Thus, it would appear that any threat to impose a 'fine,' 'assessment' or 'initiation fee,' or 'payment to join the union,' *although it may induce an employee to execute a union authorization membership card, would more probably induce him to vote 'no' at the election."* (Emphasis added.)

The Court of Appeals read the Hearing Officer's Report to state that the waiver was limited to those signing up before the election, as do we. Such a reading is amply supported by the evidence in the record beyond the testimony to which we have already alluded. The record demonstrates the pressure which employees felt to sign up with the Union quickly, before the election and perhaps even before the representation petition itself was filed, a pressure utterly inconsistent with a belief that a waiver would be available

The actual solicitation of signatures on the "recognition slips" was not done by Union officials. Union officials, however, explained to employees at meetings that those who signed the slips would not be required to pay an initiation fee, while those who did not would have to pay. Those officials also picked out some five employees to do the soliciting and authorized them to explain the Union's initiation-fee policy. Those solicited were told that there would be no initiation fee charged those who signed the slip before the election. Under the bylaws of the Union, an initiation fee apparently was not to be higher than $10; but the employees who testified at the hearing (1) did not know how large the fee would be and (2) said that their understanding was that the fee was a "fine" or "assessment."

---

to them up to the time a collective-bargaining agreement was signed after the election. It is also supported by the fact that 28 individuals signed up with the Union before the election petition was filed with the Board on August 12, 1970, and apparently an additional seven or eight signed up before the September 22, 1970, election. But there is no indication of any individuals signing up with the Union after the election, which would be the obviously rational decision once the Union had won the election.

The Board argues that unions have a valid interest in waiving the initiation fee when the union has not yet been chosen as a bargaining representative, because " '[e]mployees otherwise sympathetic to the union might well have been reluctant to pay out money before the union had done anything for them. Waiver of the [initiation fees] would remove this artificial obstacle to their endorsement of the union.' " See *Amalgamated Clothing Workers* v. *NLRB,* 345 F. 2d 264, 268 (CA2 1969). While this union interest is legitimate, the Board's argument ignores the fact that this interest can be preserved as well by waiver of initiation fees available not only to those who have signed up with the union before an election but also to those who join after the election. The limitation imposed by the Union in this case—to those joining before the election—is necessary only because it serves the additional purpose of affecting the Union organizational campaign and the election.

One employee, Donald Bridgeman, testified that he signed the slip to avoid paying the "fine" if the Union won. He got the message directly from an employee picked by the Union to solicit signatures on the "slips." So did Thomas Rice, another employee.

The Board originally took the position that pre-election solicitation of memberships by a union with a promise to waive the initiation fee of the union was not consistent with a fair and free choice of bargaining representatives. *Lobue Bros.,* 109 N. L. R. B. 1182. Later in *DIT–MCO, Inc.,* 163 N. L. R. B. 1019, the Board explained its changed position as follows:

> "We shall assume, *arguendo,* that employees who sign cards when offered a waiver of initiation fees do so solely because no cost is thus involved; that they in fact do not at that point really want the union to be their bargaining representative. The error of the *Lobue* premise can be readily seen upon a review of the consequences of such employees casting votes for or against union representation. Initially, it is obvious that employees who have received or been promised free memberships will not be required to pay an initiation fee, *whatever the outcome of the vote.* If the union wins the election, there is by postulate no obligation; and if the union loses, *there is still no obligation,* because compulsion to pay an initiation fee arises under the Act only when a union becomes the employees' representative and negotiates a valid union-security agreement. Thus, whatever kindly feeling toward the union may be generated by the cost-reduction offer, when consideration is given only to the question of initiation fees, it is completely illogical to characterize as improper inducement or coercion to

vote 'Yes' a waiver of something that can be avoided simply by voting 'No.'

"The illogic of *Lobue* does not become any more logical when other consequences of a vote for representation are considered. Thus, employees know that if a majority vote for the union, it will be their exclusive representative, and, provided a valid union-security provision is negotiated, they will be obliged to pay dues as a condition of employment. Thus, viewed solely as a financial matter, a 'no' vote will help to avoid any subsequent obligations, a 'yes' may well help to incur such obligations. In these circumstances, an employee who did not want the union to represent him would hardly be likely to vote for the union just because there would be no initial cost involved in obtaining membership. Since an election resulting in the union's defeat would entail not only no initial cost, but also insure that no dues would have to be paid as a condition of employment, the financial inducement, if a factor at all, would be in the direction of a vote against the union, rather than for it." *Id.*, at 1021–1022.

We are asked to respect the expertise of the Board on this issue, giving it leeway to alter or modify its policy in light of its ongoing experience with the problem. The difficulty is not in that principle but with the standards to govern the conduct of elections under § 9 (c)(1)(A). We said in *NLRB* v. *Tower Co.*, 329 U. S. 324, 330, that the duty of the Board was to establish "the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees."

It is, of course, true as we said in *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759, 767, that "Congress granted the Board a wide discretion to ensure the fair and

free choice of bargaining representatives." See also *NLRB* v. *Waterman S. S. Co.*, 309 U. S. 206, 226. But in this case two opposed groups are in contention: one composed of those who want a union and the other, of those who prefer not to have one. The Board in its *DIT–MCO* opinion says "it is completely illogical to characterize as improper inducement or coercion" a waiver of initiation fees for those who vote "yes" when the whole problem can be avoided by voting "no." 163 N. L. R. B., at 1021–1022. But the Board's analysis ignores the realities of the situation.

Whatever his true intentions, an employee who signs a recognition slip prior to an election is indicating to other workers that he supports the union. His outward manifestation of support must often serve as a useful campaign tool in the union's hands to convince other employees to vote for the union, if only because many employees respect their coworkers' views on the unionization issue. By permitting the union to offer to waive an initiation fee for those employees signing a recognition slip prior to the election, the Board allows the union to buy endorsements and paint a false portrait of employee support during its election campaign.

That influence may well have been felt here for, as noted,[5] there were 28 who signed up with the Union before the election petition was filed with the Board and either seven or eight more who signed up before the election. We do not believe that the statutory policy of fair elections prescribed in the *Tower* case permits endorsements, whether for or against the union, to be bought and sold in this fashion.

In addition, while it is correct that the employee who signs a recognition slip is not legally bound to vote for the union and has not promised to do so in any formal

---

[5] See n. 4, *supra.*

sense, certainly there may be some employees who would feel obliged to carry through on their stated intention to support the union. And on the facts of this case, the change of just one vote would have resulted in a 21–21 election rather than a 22–20 election.

Any procedure requiring a "fair" election must honor the right of those who oppose a union as well as those who favor it. The Act is wholly neutral when it comes to that basic choice. By § 7 of the Act employees have the right not only to "form, join, or assist" unions but also the right "to refrain from any or all of such activities." 29 U. S. C. § 157. An employer who promises to increase the fringe benefits by $10 for each employee who votes against the union, if the union loses the election, would cross the forbidden line under our decisions. See *NLRB* v. *Exchange Parts Co.*, 375 U. S. 405. The right of employees to "form, join, or assist" labor unions guaranteed by § 7 has an express sanction in § 8 (a)(1) which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of those rights. 29 U. S. C. §§ 157, 158 (a)(1). Such interference is an unfair labor practice as we held in *NLRB* v. *Exchange Parts Co., supra.* But, as already noted, § 7 guarantees the right of employees "to refrain from any or all of such activities."

Congress has also listed in § 8 (b) of the Act "unfair" labor practices of unions. 29 U. S. C. § 158 (b). There is no explicit provision which makes "interference" by a union with the right of an employee to "refrain" from union activities an unfair labor practice.

Section 8 (c), however, provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, *if such expression contains no threat*

*of reprisal or force or promise of benefit."* 29 U. S. C. § 158 (c) (emphasis added).

Whether it would be an "unfair" labor practice for a union to promise a special benefit to those who sign up for a union seems not to have been squarely resolved.[6] The right of a free choice is, however, inherent in the principles reflected in § 9 (c)(1)(A).

When the dissent says that "[t]he special inducement is to sign the card, not to vote for the union" and that treating the two choices as one is untenable, it overlooks cases like *NLRB* v. *Gissel Packing Co.,* 395 U. S.

---

[6] The lower courts have recognized that promising benefits or conferring benefits before representation elections may unduly influence the representational choices of employees where the offer is not across the board to all employees but, as here, only to those who sign up prior to the election. See, *e. g., NLRB* v. *Gorbea, Perez & Morell,* 328 F. 2d 679, 681–682 and nn. 6–7 (CA1 1964) (promise to waive initiation fee for those joining union prior to election, but not after, may substantially influence election); *Amalgamated Clothing Workers* v. *NLRB,* 345 F. 2d, at 268–269 (Friendly, J., concurring) (improper to waive fees for those joining union immediately while indicating that this is foreclosed to those joining later). See also *Collins & Aikman Corp.* v. *NLRB,* 383 F. 2d 722, 728–729 (CA4 1967) (paying employee $7 to be observer at election is an "unreasonable or excessive economic inducement" potentially influencing other employees and is ground to set aside election); *NLRB* v. *Commercial Letter, Inc.,* 455 F. 2d 109 (CA8 1972) (disproportionate payments to employees attending union "hearings" prior to representation election).

The NLRB itself has recognized in other contexts that promising or conferring benefits may unduly influence representation elections. See *e. g., Wagner Electric Corp.,* 167 N. L. R. B. 532, 533 (grant of life insurance policy to those who signed with union before representation election "subjects the donees to a constraint to vote for the donor union"); *General Cable Corp.,* 170 N. L. R. B. 1682 ($5 gift to employees by union before election, even when not conditioned on outcome of election, was inducement to cast ballots favorable to union); *Teletype Corp.,* 122 N. L. R. B. 1594 (payment of money by rival unions to those attending pre-election meetings).

575. There we held that the gathering of authorization cards from a majority of the employees in the bargaining unit may entitle the union to represent the employees for collective-bargaining purposes, even though there has been and will be no election, *id.*, at 582–583, and that rejection of that authorization by the employer is an unfair labor practice. Where the solicitation of cards is represented as being solely for the purpose of obtaining an election, a contrary result is indicated. *Id.*, at 584, 606. Thus the solicitation of authorization cards may serve one of two ends. Of course, when an election is contemplated, an employee does not become a member of the union merely by signing a card. But prior to the election if the union receives overwhelming support, the pro-union group may decide to treat the union authorization cards as authorizing it to conduct collective bargaining without an election. The latent potential of that alternative use of authorization cards cautions us to treat the solicitation of authorization cards in exchange for consideration of fringe benefits granted by the union as a separate step protected by the same kind of moral standard that governs elections themselves.

The Board in its supervision of union elections may not sanction procedures that cast their weight for the choice of a union and against a nonunion shop or for a nonunion shop and against a union.

In the *Exchange Parts* case we said that, although the benefits granted by the employer were permanent and unconditional, employees were "not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." 375 U. S., at 409. If we respect, as we must, the statutory right of employees to resist efforts to unionize a plant, we cannot assume that unions exercising powers are wholly benign towards their antagonists whether they be nonunion

protagonists or the employer. The failure to sign a recognition slip may well seem ominous to nonunionists who fear that if they do not sign they will face a wrathful union regime, should the union win. That influence may well have had a decisive impact in this case where a change of one vote would have changed the result.

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN join, dissenting.

The report of the Hearing Officer, filed in response to the Company's objections to the election, reveals that prior to the filing of the representation petition, a union organizer had told employees that, if the Union won the election, they would be subject to an initiation fee or "fine" if they did not sign an authorization card. The Union was then engaged in securing the necessary 30% showing of union support which would entitle it to hold an election under the Labor Board's rules. 29 CFR §§ 101.17, 101.18 (1973). The officer concluded that there was "insufficient evidence . . . that a threat of a 'fine' occurred either before or after the filing date of the petition." In any event, he also concluded that conduct occurring before the filing of an election petition was not ground for setting aside the election since "[w]hether or not a sufficient valid showing of interest was obtained, constitutes a matter for administrative determination." Cf. *Goodyear Tire & Rubber Co.,* 138 N. L. R. B. 453 (1962).[1]

After the representation petition was filed and the election campaign proper commenced, the Union's Sec-

---

[1] The opinion for the Court places no special emphasis on the fact that the waiver of initiation fees may have been referred to as a "fine." Since the Hearing Officer expressly found that no such representation was made, the matter deserves no further attention.

retary-Treasurer, Alfred Smith, addressed a group of about 20 employees at an organization meeting. In response to a question about the initiation fee, Smith indicated that there was "a small fee" which would be waived for all employees who signed cards prior to the election.[2] The fee was, in fact, $10. Qualification for fee waiver was obtained by signing membership cards, but the testimony indicated that no one incurred any obligation to the Union until and unless the Union became the bargaining agent and a collective contract was signed. The Hearing Officer found "no evidence, nor any contention, that the Union misrepresented to employees that they would have to become members immediately upon the certification of the union as bargaining agent."

On this record, the Board, obviously relying on its decision in *DIT–MCO, Inc.,* 163 N. L. R. B. 1019 (1967), enforced, 428 F. 2d 775 (CA8 1970), which overruled its prior decision in *Lobue Bros.,* 109 N. L. R. B. 1182 (1954), ordered the employer to bargain with the Union. 194 N. L. R. B. 298 (1971). The Sixth Circuit denied enforcement of the order, 470 F. 2d 305 (1972), and the majority now affirms that judgment.

Because in my view the Labor Board has "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees," *NLRB* v. *Tower Co.,* 329 U. S. 324, 330 (1946), and because I am unpersuaded that the waiver of initiation fees in this case is so clearly coercive within § 7 of the National Labor Relations Act that the Board has abused its discretion in finding otherwise, I respectfully dissent.

---

[2] Mr. Bridgeman, an employee who attended the meeting, testified that his brother asked Smith if there was a fee for joining the union. Mr. Smith's answer was "[t]here would be a small fee." App. 28.

## I

It is well established that an "unconditional" offer to waive initiation fees, where the waiver offer is left open for some period of time after the election, is not coercive and does not constitute an unfair labor practice. The Sixth Circuit itself has so held, *NLRB* v. *Gafner Automotive & Machine, Inc.,* 400 F. 2d 10 (1968), and other courts of appeals have reached the same result. *Amalgamated Clothing Workers* v. *NLRB,* 345 F. 2d 264 (CA2 1965); *NLRB* v. *Crest Leather Mfg. Corp.,* 414 F. 2d 421 (CA5 1969). The existence of the initiation fee is created by the union ˙and represents .a self-imposed barrier to entry.[3] There is no evidence that the fee is normally imposed for the sole purpose of removing it during a labor campaign. A different case might be put if the union purported to remove a nonexistent fee or artificially inflated the fee so as to misrepresent the benefit tendered by its removal. See *NLRB* v. *Gorbea, Perez & Morell,* 328 F. 2d 679 (CA1 1964). Similarly, it is established that the union can promise employees to obtain wage increases or other benefits if it is elected as a bargaining representative. *Wilson Athletic Goods Mfg. Co.* v. *NLRB,* 164 F. 2d 637 (CA7 1947).

It must be obvious that these waivers of fees are a form of economic inducement, as the opinion for the Court employs that term. Undoubtedly an offer to reduce the cost of joining the union makes the union a

---

[3] The role of the initiation fee has been described by one writer as follows: "Initiation fees serve several sorts of union purposes. First, of course, they are a source of revenue, which is occasionally expendable however during an organization drive when the union is anxious to induce workers to join the union. Second, the initiation fee represents for the older member a kind of equity payment by the new member to compensate, at least partially, for the efforts that others have put into building the union. . . ." J. Barbash, The Practice of Unionism 79 (1956).

more attractive possibility and may influence an employee to vote for the union, though one would assume, in view of the other costs and benefits at stake, that this consideration will be marginal. Similarly, if the union represents to the employees that it will attempt to secure higher wages, an employee's calculations of costs and benefits will be altered, but in that instance the union is merely stating the obvious; indeed, the promise of higher wages is the primary rationale for the existence of the union. In any event, these forms of inducement are valid.

In the instant case, an offer which by its terms expires with the conclusion of the election is also a form of economic inducement. But insofar as the offer might affect the calculation of costs and benefits of joining the union, its effect is the same as an offer which does not expire until some time after the election. The inability to distinguish between these two situations, at least where small fees are involved and where the sole source of concern is pure financial inducement, led the Board to conclude in *DIT-MCO* that "an employee who did not want the union to represent him would hardly be likely to vote for the union just because there would be no initial cost involved in obtaining membership." 163 N. L. R. B., at 1022.

The majority places heavy reliance on the supposed analogy between the waiver of fees in this case and an actual increase in benefits made by an employer during the course of an election campaign. *NLRB* v. *Exchange Parts Co.*, 375 U. S. 405 (1964). There the employer increased vacation-pay benefits during the course of the campaign. The Court agreed with the Board that this was coercive activity on the part of the employer, and accordingly reversed the Court of Appeals, and ordered enforcement of the Board's order. It was stated that

"[t]he danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove." *Id.*, at 409. A number of important differences exist between that case and the instant one. First, the employer actually gave his employees substantial increased benefits, whereas here the benefit is only contingent and small; the union glove is not very velvet. Secondly, in the union context, the fist is missing. When the employer increased benefits, the threat was made "that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Ibid.* The Union, on the other hand, since it was not the representative of the employees, and would not be if it were unsuccessful in the election, could not make the same threat by offering a benefit which it would take away if it *lost* the election. A union can only make its own victory more desirable in the minds of the employees.[4]

## II

If pure economic inducement in the form of lowering anticipated costs of joining the union is not to be con-

---

[4] The Court cannot ignore the fact, as well, that § 1 of the National Labor Relations Act declared the congressional policy of "encouraging the practice and procedure of collective bargaining." 29 U. S. C. § 151. The existence of unions is an inescapable corollary of this preference. To the extent that this Court prohibits the union from promising a fairer deal for unionized employees by describing the benefits to be obtained by unionization, this policy is seriously eroded. This Court has often underscored this preference in the Act. See, *e. g., Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 182 (1941); *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175, 180 (1967). This preference is only one of opportunity and the free choice of the employee must be protected, but restrictions on the communications of the union as to potential benefits may unduly prevent the intelligent exercise of such choice. The employer may garner loyalty through his actions and record of past performance for his own employees; the union can only sell employees the future.

sidered coercive, one must focus on the special dangers, if any, presented by the conditional offer, an analysis not undertaken by the majority. It has been proposed that the conditional offer is specially to be proscribed because of the interjection of a new consideration into the voting choice of an employee: how probable it is that the union will win or lose the election. *NLRB* v. *Gafner Automotive & Machine, Inc.*, 400 F. 2d, at 13 (Phillips, J., concurring); *Amalgamated Clothing Workers* v. *NLRB*, 345 F. 2d, at 268 (Friendly, J., concurring). The argument might be that an employee who estimates that the costs of joining the union exceed the benefits, even taking into account the reduced initiation fees available by signing a card, will still sign the card, as a hedge, because of his prediction that the union will win the election.[5] A statement of the theory carries with it its own disproof. The special inducement is to sign the card, not to vote for the union. The majority decision collapses these two choices into one, and is thus untenable. The majority assumes, contrary to fact, that the employee has joined the Union by signing the authorization card. This is only true, however, if the Union wins the election and signs a collective contract, and the employee can still seek to prevent that outcome by cast-

---

[5] This possibility of hedging is to some extent borne out by the record. Although the Court cannot know what the correlation was between signed cards and votes for the Union, we do know that not everyone who signed cards voted for the Union. Twenty-eight persons plus signed cards (App. 75) and only 22 voted for the Union. Moreover, there is testimony that some employees discussed the hedge. "Of course some of us fellows did say to other fellows that were really against it [the Union] and *have always been against it* you better sign your ticket and turn it in because if you didn't if it does get voted in, if the majority of the men vote the union in, at least you have to pay your dues which is very natural but you wouldn't have to pay no initiation fee." App. 28–29. (Emphasis added.)

ing his vote against the Union in a secret ballot. The testimony was clear that if the Union loses the election, the employee who signs the card incurs no obligation to the Union. The expressed preference in the National Labor Relations Act for secret ballot elections assumes that voters may act differently in private than in public, and ordinarily guarantees to employees the ability to make a secret choice. It is, therefore, important to highlight the fact that the Board in *DIT–MCO* assumed, *arguendo*, "that employees who sign cards when offered a waiver of initiation fees do so solely because no cost is thus involved; that they in fact do not at that point really want the union to be their bargaining representative." 163 N. L. R. B., at 1021.

There is no need to consider here, as does the majority, whether the Union could achieve recognition on the basis of authorization cards secured, in part, by an offer of fee waiver. Of course, a card majority cannot serve as a basis for a § 8 (a)(5) bargaining order under *NLRB v. Gissel Packing Co.*, 395 U. S. 575, 614–616 (1969), unless the employer has committed serious unfair labor practices. It may be that even given a serious unfair labor practice on the part of the employer, these cards could not serve as a basis for recognition. In this case, however, the Board's bargaining order was based on the vote of a secret ballot election, and the Court must supply the connective between the decision to sign a card and the decision to vote for the Union.[6]

---

[6] As to the possible effect of the fee waiver offer on securing the 30% showing necessary for holding an election, whether or not there is a valid showing is a matter for administrative determination not subject to litigation by the parties. *Goodyear Tire & Rubber Co.*, 138 N. L. R. B. 453 (1962). Courts of appeals have uniformly so held. See *NLRB v. J. I. Case Co.*, 201 F. 2d 597 (CA9 1953); *NLRB v. White Constr. & Eng. Co.*, 204 F. 2d 950, 953 (CA5 1953); *Kearney & Trecker Corp. v. NLRB*, 209 F. 2d 782, 787–788 (CA7

This connective can only be supplied by some rather speculative counter-rational psychological assumptions, *i. e.,* that a person who signs the card *will* vote for the union.[7] The Board assumes that such is not the case, and I am not prepared to upset the Board's judgment on this matter.[8] The majority opinion stresses the fact that the margin of Union victory was only two

1953); *NLRB* v. *National Truck Rental Co.,* 99 U. S. App. D. C. 259, 261–262, 239 F. 2d 422, 424–425 (1956) (Burger, J.), cert. denied, 352 U. S. 1016 (1957); *NLRB* v. *Louisville Chair Co.,* 385 F. 2d 922, 926–927 (CA6 1967); *Intertype Co.* v. *NLRB,* 401 F. 2d 41, 43 (CA4 1968), cert. denied, 393 U. S. 1049 (1969).

[7] It is certainly arguable that such a connection can be made when the union pays a person cash to vote for or assist the union. The benefit of the union has been tendered and the employee may well feel he has incurred a moral obligation to vote for the union. See, *e. g., Wagner Electric Corp.,* 167 N. L. R. B. 532, 533 (1967) (grant of life insurance policy to those who signed with union before representation election "subjects the donees to a constraint to vote for the donor union"). See also *Collins & Aikman Corp.* v. *NLRB,* 383 F. 2d 722 (CA4 1967) (payment of $7 to employee to be observer at election); *NLRB* v. *Commercial Letter, Inc.,* 455 F. 2d 109 (CA8 1972) (excessive payments to union members to attend meetings). In *Wagner, supra,* the Board distinguished the initiation fee decision in *DIT–MCO, Inc.,* 163 N. L. R. B. 1019 (1967), on the ground that there was no immediate improvement in an employee's economic situation when fees were waived.

[8] The majority in its conclusion seems to articulate still another theory of coercion: "The failure to sign a recognition slip may well seem ominous to nonunionists who fear that if they do not sign they will face a wrathful union regime, should the union win." This theory, of course, assumes a card signer will vote for the union. Moreover, this problem is fundamental in labor elections, at the outset, when cards are collected for the purpose of holding an election pursuant to the necessary showing of support, and, at the conclusion, if the union wins, when those who oppose the union must still decide to join the union or face the union's wrath. One could easily argue that at least an equal deterrent to signing the card is the wrathful employer if the union *loses* the election.

votes, and thus suggests that the "psychological connective" may explain the outcome indicating that it *"may well have* had a decisive impact" (emphasis added). But there is no evidence to this effect, and definitions of unfair practices which become a function of the outcome of an election are subject to severe problems of administration. The Board, in my judgment, is entitled to regulate elections on standard theories of coercion.

## III

Since the case for coercion arising out of the conditional offer is speculative, and since the alteration of the calculus of costs and benefits is marginal where a small fee is involved, the issue here resolves into the proper allocation of institutional responsibility between an administrative agency and a reviewing court. The Board, upon reflection and study, has concluded that the conditional offer is not coercive within the meaning of § 7. This represented a basic change in policy but "one of the signal attributes of the administrative process is flexibility in reconsidering and reforming of policy." *City of Chicago* v. *FPC*, 128 U. S. App. D. C. 107, 115, 385 F. 2d 629, 637 (1967). Such revisions are especially likely in the regulation of labor elections, due to the substantial problems in deciding what is likely to interfere with employee free choice. See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv. L. Rev. 38, 44–45 (1964).

While the invocation of agency expertise is not talismanic, see *Radio Corp.* v. *United States,* 341 U. S. 412, 421 (1951) (Frankfurter, J., *dubitante*), and while the decision of the Board must be supported by substantial evidence, *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474 (1951), one cannot ask the agency to do the impossible. When choosing between alternative contentions

of coercion, the agency must make judgments based on available knowledge. This is a difficult task and accounts in part for the decision of Congress to entrust the Board "with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB* v. *Tower Co.*, 329 U. S., at 330. Recognition of this discretion has been a recurrent theme in this Court's review of Board decisions. *NLRB* v. *Waterman S. S. Co.*, 309 U. S. 206, 226 (1940); *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759, 767 (1969). In other contexts, the Board has had to perform the "far more delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner . . . ." *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 229 (1963); *American Ship Bldg. Co.* v. *NLRB*, 380 U. S. 300, 312 (1965). There is certainly a conflicting interest between the union's right to make itself attractive to employees without misrepresentation and the employee's unfettered choice to vote for or against the union. I think it is rational for the Board to conclude on the basis of the facts presented that the decision of the Union to waive small fees was not coercive within the meaning of § 7. I, therefore, respectfully dissent.