**S. Jesse REUBEN, Regional Director of The Washington, D.C., Region of The Federal Labor Relations Authority, for and on Behalf of The FEDERAL LABOR RELATIONS AUTHORITY, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

Civ. A. No. 91–372(MB).

United States District Court, District of Columbia.

April 10, 1991.

 

Bruce D. Rosenstein, Federal Labor Relations Authority, Washington, D.C., for plaintiff.

Thomas A. Schulz, Federal Deposit Ins. Corp., Washington, D.C., for defendant.

## MEMORANDUM OPINION

BOUDIN, District Judge.

In this case plaintiff, Regional Director of the Washington, D.C. Region of the Federal Labor Relations Authority, seeks a temporary injunction against the Federal Deposit Insurance Corporation ("FDIC"), to compel the FDIC to recognize and bargain with the union representing certain of the FDIC's employees. The union, National Treasury Employees Union ("Union"),

has filed memoranda amicus curiae in support of the Authority. For the reasons stated below, the requested temporary injunction is granted. This memorandum opinion constitutes the Court's findings of fact and conclusions of law.

## I. THE FACTS

Among the functions of the FDIC is the liquidation of various failed banks across the country. A large number of employees engaged in this activity are hired by the FDIC on a non-competitive basis as temporary employees of the agency. The FDIC currently has thousands of such employees located at sites throughout the United States.

The Federal Labor Relations Authority ("FLRA" or "Authority") performs for federal employee labor relations functions similar to those performed by the National Labor Relations Board for non-federal employees. The Authority acts pursuant to the Federal Service Labor–Management Relations Act ("FSLMRA"), 5 U.S.C. § 7101 et seq. (1980 & Supp.1990).

The present controversy arises out of the efforts of the Union, a labor organization representing over 100,000 federal employees, to represent certain professional and non-professional employees of the FDIC's Division of Liquidation, Division of Accounting and Corporate Services and Legal Division employed at FDIC offices located throughout the United States, about 80 percent of whom are temporary employees. Beginning in late April 1990 and continuing through May 1990, the Authority conducted a representation election among these employees. The Union prevailed in the election. Professional employees favored a bargaining unit separate from non-professional employees, and therefore two separate elections were conducted. Among the professional employees, there were 76 valid votes cast, 46 of which, or 66 percent, were in favor of the Union. With respect to the non-professional employees, there were

1,848 valid votes cast, 1,273 of which, or 69 percent, were in favor of the Union.

Immediately after the election, the FDIC filed objections with the Authority seeking to have the election invalidated because of actions taken by the Union in the course of the election campaign. Specifically, the FDIC objected to the Union's promise to the temporary employees it sought to represent that, if successful in the election, it would file a lawsuit challenging their temporary status and seeking a measure of tenure for them. The FDIC also complained that the Union had provided free legal representation prior to the election to some five employees who had been terminated by the FDIC.

On August 21, 1990, the Authority's Regional Director ("RD") in its Washington, D.C. Regional Office rejected, in a detailed opinion, the FDIC's challenge to the election on these two grounds. The FDIC sought review of the RD's decision by the Authority itself. On December 14, 1990, the Authority denied the FDIC's petition for review. On December 28, 1990, the Authority certified the Union as the exclusive representative of the two bargaining units, one for professional and one for non-professional employees.

Under the FSLMRA, as under the Labor–Management Relations Act ("LMRA"),[1] an employer challenging a union election is not entitled to direct judicial review of an Authority decision upholding the election. See 5 U.S.C. § 7123(a)(2). Instead, such a decision may be brought before the courts only when an employer refuses to bargain with the newly certified union, is charged by the Authority with an unfair labor practice, offers as a defense the invalidity of the election, is found by the Authority to have committed the unfair labor practice, and then appeals that finding to the Court of Appeals.[2]

In this case, when the Union in early January 1991 sought to negotiate with the

---

1. The LMRA, 29 U.S.C. §§ 141 et seq. (1973 & Supp.1990), which amended the National Labor Relations Act ("NLRA"), governs non-federal employee labor matters, and the FSLMRA borrows substantially from it.

2. See Department of Energy v. FLRA, 880 F.2d 1163, 1165 n. 3 (10th Cir.1989).

FDIC on behalf of the employees in question, the FDIC responded in a letter dated January 25, 1991, that it would not comply with the bargaining request because it challenged the Union's certification. Accordingly, to this date the FDIC has refused to recognize the Union as the certified representative of the bargaining unit employees, has refused to negotiate with the Union, has refused to allow the Union to represent bargaining unit employees in connection with terminations, office closures and the like,[3] and has generally refused to accord to the Union those rights to which a certified bargaining representative is entitled under the FSLMRA. Accordingly, the Union filed an unfair labor practice charge with the Authority on February 4, 1991. On February 11, 1991, the Regional Director issued a complaint against the FDIC charging it with the commission of an unfair labor practice in violation of the FSLMRA, specifically 5 U.S.C. §§ 7116(a)(1), (5) and (8).[4] A hearing was scheduled before an Administrative Law Judge, but the parties have agreed to waive the hearing, stipulate to the facts and present the matter directly to the Authority. Briefs are due to be submitted to the Authority on April 16, 1991.

On February 20, 1991, the Regional Director brought this action against the FDIC seeking a temporary restraining order and an injunction under section 7123(d) of the FSLMRA, 5 U.S.C. § 7123(d), to enjoin the FDIC from continuing to refuse to recognize and bargain with the Union during the pendency of the litigation over the unfair labor practice charge. Section 7123(d) empowers district courts to grant temporary relief, on petition of the FLRA, against any person who is the subject of a complaint before the Authority charging the person with engaging in an unfair labor practice. The standards and conditions for relief set forth in section 7123(d) are discussed in the following portion of this memorandum.

After a hearing on February 21, 1991, this Court denied the request for a temporary restraining order, but set the matter down for hearing on the request for injunctive relief following an opportunity for the FDIC to respond in writing. The hearing was held on March 12, 1991. The Court requested supplemental briefs from the parties, which were filed on or before March 26, 1991, and the Court held an additional hearing on April 8, 1991, to obtain further information.

## II. DISCUSSION

■ Under section 7123(d), the Court is empowered to provide such temporary relief as the Court finds to be "just and proper" if two conditions are met.[5] First,

---

**3.** Under 5 U.S.C. § 7114, an exclusive representative of a bargaining unit is entitled to be present at specified employment-related events, including "any formal discussion between one or more representatives of the agency and one or more employees in the unit ... concerning any grievance or any personnel policy or practices." 5 U.S.C. § 7114(a)(2)(A).

**4.** Section 7116(a)(1) provides that it shall be an unfair labor practice for an agency "to interfere with, restrain, or coerce any employee in the exercise by the employee of any right" under the FSLMRA. 5 U.S.C. § 7116(a)(1). Subsection (a)(5) provides that it shall be an unfair labor practice for an agency "to refuse to consult or negotiate in good faith with a labor organization" as required under the FSLMRA. 5 U.S.C. § 7116(a)(5). And subsection (a)(8) generally provides that it shall be an unfair labor practice for an agency "to otherwise fail or refuse to comply with any provision" of the FSLMRA. 5 U.S.C. § 7116(a)(8).

**5.** Specifically, section 7123(d) provides:

The Authority may, upon issuance of a complaint as provided in section 7118 of this title charging that any person has engaged in or is engaging in an unfair labor practice, petition any United States district court within any district in which the unfair labor practice in question is alleged to have occurred or in which such person resides or transacts business for appropriate temporary relief (including a restraining order). Upon the filing of the petition, the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant any temporary relief (including a temporary restraining order) it considers just and proper. A court shall not grant any temporary relief under this section if it would interfere with the ability of the agency to carry out its essential functions or if the Authority fails to establish probable cause that an unfair labor practice is being committed.

5 U.S.C. § 7123(d). Section 7123(d) of the FSLMRA is a counterpart to, but differs in certain respects from, section 10(j) of the LMRA,

the statute directs that such relief may be granted only if the Court finds that there is probable cause to believe that an unfair labor practice is being committed. Second, the Court is forbidden to grant such relief if it would interfere with the agency's "essential functions." This decision first considers the latter two preconditions and then addresses the question of whether and what kind of relief is just and proper.

## A. Probable Cause

■ The meaning, as well as the application, of the "probable cause" provision is disputed by the parties. Interpretations offered range from the suggestion that no further inquiry need be made once the Authority has determined to commence an unfair labor practice proceeding, to the contention that any non-frivolous challenge to the election defeats a showing of probable cause where, as here, no other way of challenging the election is possible other than refusing to bargain and litigating the unfair labor practice charge that follows.

In fact, the content of the "probable cause" requirement in the context of section 7123(d) is considerably less than clear.[6] There are cases, especially in the criminal context, that suggest that something less than a likelihood or probability suffices for a finding of probable cause.[7] On the other hand, there is an argument, based both on the literal language of the phrase "probable cause" and its context in the present statute, that a district court contemplating an injunction ought to find that the charged parties are more likely than not to have committed an unfair labor practice.[8] In this instance, a final selection among these standards need not be made because the Court believes that even under a "more likely than not" standard the Authority has met its burden. To the extent that the standard is less stringent, the Authority would satisfy it more readily.

The probable cause determination required by the statute is not a prediction by this Court as to the Authority's likely action or that of the Court of Appeals. Although the Authority has already taken the position that the election was valid, it might revisit the issue. As for the Court of Appeals, there is no way to be certain how the record will appear by the time the Authority writes a final decision and the case is presented to the appellate court for direct review. Accordingly, as with probable cause determinations in other contexts, this Court's evaluation merely reflects the posture of the case today and the arguments the parties have made so far on the record that currently exists.

In this case, disposition of the unfair labor practice charge rests entirely on the

---

29 U.S.C. § 160(j). Section 10(j) contains the "just and proper" language found in section 7123(d), but contains neither an explicit probable cause requirement nor the essential functions restriction.

**6.** In attempting to evaluate the analogous "reasonable cause" requirement that has been read into section 10(j) of the LMRA by some courts, the Seventh Circuit has stated, "[T]here has been anything but unanimity among the circuits on the question what it takes for the Director to demonstrate reasonable cause. Each court couches its standard in different terms, some using more than one formulation." *Kinney v. Pioneer Press*, 881 F.2d 485, 488 (7th Cir.1989) (footnote omitted).

**7.** *See, e.g., Gramenos v. Jewel Cos.*, 797 F.2d 432, 438 (7th Cir.1986) ("probable cause" is "less than a rule of more-likely-than-not, but how much less depends on the circumstances"), *cert. denied*, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); *United States v. Melvin*, 596 F.2d

492, 495 (1st Cir.) ("probable cause" does not mean "more likely than not;" rather, "the words 'reasonable cause' are perhaps closer to what is meant"), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1987).

**8.** The "probable cause" language can be juxtaposed with the seemingly less stringent "reasonable cause" requirement that applies to a decision by the appropriate officer or regional attorney of the NLRB whether to bring an action for temporary injunctive relief under section 10(*l*) of the LMRA, 29 U.S.C. § 160(*l*), as well as with the "reasonable cause" requirement that has been read into section 10(j) as a prerequisite for the granting of temporary relief under the LMRA. In addition, in section 7123(d), the probable cause requirement is paired with another significant restriction on the grant of injunctive relief—the "essential functions" limitation—and, taken together, these provisions may indicate that Congress intended that a substantial hurdle be overcome before injunctive relief is issued against a federal agency.

issue of the validity of the election. In other words, if the election was valid, there is no question that an unfair labor practice is being committed—the FDIC does not deny that it has refused and is refusing to accord to the Union all rights to which a validly certified bargaining representative is entitled under the FSLMRA. As stated above, the Authority already has taken the position that the election was valid. Ordinarily, one would expect that the decision of a federal agency such as the Authority on a matter within its expertise—such as whether a union's pre-election activities require setting aside a representation election—would be afforded a substantial amount of deference, and the decisions from this Circuit support such a standard.[9] The situation here may be somewhat different, however, because of the FDIC's claim that the Supreme Court's decision in *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), directly governs this case and forbids the union conduct at issue here. Here the parties are litigating in the shadow of a Supreme Court decision in which the Court found an election to be tainted and rejected the agency's finding to the contrary notwithstanding the agency's asserted expertise. *See id.* at 276–77, 94 S.Ct. at 498–99. In these circumstances, it is at least arguable that the FDIC's claims should be measured against *Savair* and the decisions that have followed it.

In *Savair*, the Court held that a union's pre-election promise to waive union initiation fees for all employees who signed union "recognition slips" prior to the election interfered with the holding of a free and fair election and violated the LMRA. The rationale for this decision was twofold. First, the Court was concerned that the union's promise might have encouraged employees to sign recognition slips on a purely economic basis having no rational relationship to the merits of union representation, and therefore might have allowed the union to paint a misleading picture of its pre-election support among employees. *See id.* at 277, 94 S.Ct. at 499 (the promise "allow[ed] the union to buy endorsements and paint a false portrait of employee support during its election campaign"). Second, even though the employees in *Savair* were not required to vote for the union in order to take advantage of the initiation fee waiver (but rather were required only to sign the recognition slips), the Court was concerned that employees might feel obligated to vote for the union once they had expressed pre-election support by signing the slips. *See id.* at 277–78, 94 S.Ct. at 498–99. The Court observed that a change of just one ballot would have altered the result of the election, which the union won 22 votes to 20. *Id.* at 278, 281, 94 S.Ct. at 499, 501.

The FDIC's first challenge in this case is based on the Union's promise to commence litigation in favor of the temporary employees. In this Court's view, the Authority has distinguished this promise from that involved in *Savair*, because the promise here applies to *all* temporary employees regardless of their pre-election support for Union representation at any point during the election process. In *Molded Acoustical Products, Inc. v. NLRB*, 815 F.2d 934 (3d Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 286, 98 L.Ed.2d 247 (1987), for example, the court held that a union's promise to waive all initiation fees if it prevailed in the election is different from the promise held unlawful in *Savair*, and did not taint the election. The "key" to this distinction, the court stated, was that the promise "was made to all employees without concern for whether they supported the union during any phase of the elective process." *Id.* at

---

**9.** *See, e.g., C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 882 (D.C.Cir.1988) ("[T]he [NLRB] is entrusted with a wide degree of discretion in conducting representation elections.... The scope of our review of such decisions is narrow." (citations omitted)); *American Federation of Government Employees v. FLRA*, 712 F.2d 640, 643 (D.C.Cir.1983) ("An FLRA interpretation of the [FSLMRA], if reasonable and coherent, commands our respect."); *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 827 (D.C.Cir. 1970) ("The [NLRA] entrusts the conduct of representation elections to the [NLRB], which must have wide discretion in controlling and overseeing the election process.").

937.[10] The rules governing what may or may not be promised to employees are admittedly unclear, and it may be that the FDIC can persuade a reviewing court to draw the line it urges. But it would be a line drawn in a different place and for a different purpose than the line drawn in *Savair*. Once outside the shadow of *Savair* itself, this Court believes that the ordinary deference afforded to the agency tips the balance.

The Union's provision of free legal representation to the five or so discharged employees rests on a different footing. It is not in fact a "promise" of any kind, but rather a pre-election benefit directly conferred on a group of employees. This conferral of benefits on Union supporters does appear to implicate the second concern of *Savair*, and cannot be answered merely by asserting, as the Union has, that it had a moral obligation to seek the employees' reinstatement. Moreover, the FDIC points to a number of cases in which the Union's provision of benefits to employees prior to

the election was held to be unlawful and to require a re-election.[11]

It is true that there is an emphasis in the cases on the need to maintain "laboratory conditions" in the conduct of elections, and that elections have been invalidated for what might be thought to be fairly minor breaches of this standard.[12] Nevertheless, whatever the law may be in other circuits, there are several decisions of this Circuit that seriously undermine the FDIC's claim. In substance, these cases indicate that for a court to invalidate an election there must be not only a taint in the election process but also a substantial basis for believing that the misconduct altered the outcome.[13] Put differently, it appears in this Circuit that, at the very least, the Authority is not required to invalidate the election where it believes that the limited scope of challenged conduct is not likely to have affected the outcome. Here, the Union prevailed in the elections by significant margins, and there appears to be little likelihood, at least based on the evidence presently before the Court, that the rather limited conduct challenged here affected the results.[14] Accord-

10. The FDIC argues extensively that the Union's promise in this case is illegitimate because fulfillment of the promise to initiate litigation is exclusively within the Union's control, unlike a promise of a wage increase (which has been held to be a proper union campaign pledge) which is understood to require employer cooperation and acquiescence. The Court finds this distinction untenable. The mere commencement of litigation is indistinguishable, in the Court's view, from a request or demand for a wage increase; neither confers any benefit upon the employees in and of itself, but rather requires the ultimate cooperation of some third party.

11. *E.g., NLRB v. Madisonville Concrete Co.,* 552 F.2d 168 (6th Cir.1977) (election set aside where union "took care of" one employee's traffic ticket prior to election); *Mailing Servs. Inc.,* 130 L.R.R.M. (B.N.A.) 1465 (N.L.R.B.1989) (election set aside where union provided medical benefits to employees prior to election); *Wagner Electric Corp.,* 167 N.L.R.B. 532 (1967) (pre-election provision of life insurance held impermissible).

12. *See, e.g.,* cases cited in note 11, *supra.*

13. *See, e.g., C.J. Krehbiel Co.* 844 F.2d at 882 ("[A] party attempting to set aside a representation election must demonstrate that the conduct complained of interfered with the employees' exercise of free choice to such an extent that it materially affected the election."); *Amalgamat-*

*ed Clothing Workers,* 424 F.2d at 827 ("For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls." (quoting *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 32 (5th Cir.1969), and *NLRB v. Zelrich Co.,* 344 F.2d 1011, 1015 (5th Cir.1965)). In *Amalgamated Clothing Workers,* the court, in support of its decision not to set aside an election, stated: "There was no evidence that the alleged misconduct was widespread, that any of the 276 employees who voted, other than the six persons affected, was even aware of the incidents, or that the incidents occurred in such proximity to the date of the election that they might have had any special significance to other voters." 424 F.2d at 827.

14. The FDIC counters that when it made its original election objections to the Authority, it was denied an evidentiary hearing in which it might have been able to produce evidence that other employees learned of the special benefits that were conferred on the five employees. Although this argument is open to the FDIC, the wide margin of the victory makes this argument doubtful in light of Circuit precedent, *see supra* note 13, and in light of cases upholding NLRB decisions not to hold evidentiary hearings for the purpose of probing voter motivation, *see Molded Acoustical Products,* 815 F.2d at 940 (not

ingly, the Court finds that probable cause is established.

### B. Essential Functions

■ The FDIC has filed an extensive affidavit of the Director of its Office of Personnel Management responsible for employee relations with the FDIC's 20,000 employees ("Squerrini Affidavit"). The Squerrini affidavit summarizes the recent explosion in bank failures and the large number of banks expected to be closed through the remainder of this year and next year. Squerrini Affidavit at ¶ 7. The Squerrini affidavit estimates that some 8,000 employees will be affected by the decision in this case. *Id.* at ¶ 8.

The Squerrini affidavit describes the extensive negotiations that would occur if the Union's negotiating schedule were accepted, necessitating the commitment of substantial amounts of time by senior representatives of the three divisions at issue and other units of the agency. *Id.* at ¶¶ 9–12. The Squerrini affidavit asserts that any interim agreement would complicate the FDIC's position if the election were later overturned, and states that the FDIC "simply does not have the time, manpower or other resources to expend on negotiations that would be rendered moot in the event that the certification is overturned." *Id.* at ¶ 9. The Squerrini affidavit specifies that twelve new positions would have to be established at a minimum if the FDIC were compelled to negotiate at this time. *Id.* at ¶ 11.

The Court has been provided with little precedent or legislative history concerning the governing "essential function" language in section 7123(d). The Court accepts the claim that the FDIC will be burdened if an injunction were granted, and that this is a particularly difficult and demanding period for the agency. This burden deserves appropriate weight in evaluating what relief, if any, is just and proper, and in balancing the conflicting equities. The Court does not believe, however, that an injunction requiring the FDIC to recognize and bargain with the Union would prevent the agency from carrying out its essential functions or would create a substantial risk that it would fail to carry out those functions.

There are unions throughout the government, including unions in agencies with missions as sensitive and demanding as those of the FDIC. The need for twelve additional employees, in an organization that already has some 20,000, does not sound like a debilitating additional burden. Although the time of senior management is a precious commodity, this time will have to be spent, or responsibility delegated in some fashion, if the Union ultimately prevails in this case. It may be that these energies and resources will be wasted if the Union certification is overturned, assuming the Union does not win the next election. But this is an equitable argument against the issuance of the injunction, rather than a showing that an essential agency function will be impaired.

### C. Just and Proper

■ The parties have substantially different views about the meaning of the provision that the Court has jurisdiction to grant "any temporary relief ... it considers just and proper." The FDIC appears to believe that the Court must act in accordance with customary equitable standards, under which injunctive relief depends on the probability of success on the merits, the balance of harms to the parties, and public interest considerations. The Authority, by contrast, indicates that a reading of the precedents makes injunctive relief virtually mandatory once the Court finds that probable cause is established and that there is no interference to essential agency functions.

The Court believes that it retains discretion under the statute to exercise its traditional equitable judgment in determining whether or not to grant an injunction. That conclusion flows from the express

error for NLRB to refuse to hold evidentiary hearing to explore employees' subjective motiva-

tions for voting in representation election).

language of the statute in providing that the Court has jurisdiction to grant any temporary relief it considers just and proper. This sequence of words ("any," "it considers," "just and proper") is consistent with notions of discretion and equity. This view, moreover, is supported by the only direct authority located construing section 7123(d). In a 1981 decision, this Court stated: "By directing that the District Court shall grant injunctive relief only when it is 'just and proper' to do so, section 7123 of title 5 incorporates standards similar to those which are traditional to courts of equity." *United States v. PATCO, Inc.*, 524 F.Supp. 160, 163 n. 3 (D.D.C.1981).

The Court is mindful of *International Union v. NLRB*, 449 F.2d 1046 (D.C.Cir. 1971), cited by the Authority, which construes Section 10(j) of the NLRA. That case indicates that the NLRB in seeking injunctive relief to compel bargaining would not need to show "irreparable injury" because enforcement of an employer's obligation to bargain is itself an adequate public purpose. *Id.* at 1051. *International Union* makes it easier for the Authority to satisfy one major element in the traditional equitable equation, but it does not preclude the Court from considering all of the factors in deciding whether a temporary injunction is "just and proper" in the circumstances of this case.

█ Weighing all of the circumstances, this Court believes that the injunction sought is "just and proper" in this case. This judgment rests on a set of considerations, including the traditional equitable factors and others peculiar to this case. Although the balance is a close one, the Court finds that the case for interim relief has been established.

First, for the reasons set forth in detail in the "probable cause" section of this Opinion, the Court believes that the "likelihood of success" criteria weighs in favor of the Authority. In light of the earlier discussion of the merits, no additional analysis is necessary here.

Second, looking at the potential harms and benefits to both sides, although the overall balance is quite close, the Court believes that balance is at least consistent with granting relief. Both sides have articulated potential short-term harms that are legitimate but not overwhelming. The Authority and Union have argued that bargaining unit employees are being harmed by a lack of Union representation during this interim period at significant events such as transfers, terminations, forced details, reassignments, office closures and the like, at which the Union might play a significant role. Although the Authority has documented that such events are indeed occurring without Union participation, *see, e.g.,* Affidavit of Richard H. Ruth; Affidavit of Carl S. Deck; Declaration of David M. House, the effect that the Union would have on these events even if it were permitted to participate involves some degree of speculation. It has also been argued that the Union and the employees are being injured in the short term by the loss of other entitlements such as dues withholding and the right to obtain information from the employer.

On the other side of the scale, the FDIC asserts that it will be harmed in the short term by the immediate commitment of time and resources, and the accompanying disruption of its day-to-day affairs, that would be required in order for it to comply with an injunction. The fact that, as the Court found in an earlier portion of this Opinion, the "essential functions" of the FDIC will not be curtailed does not, of course, mean that injury to the FDIC is irrelevant to the "balance of harms" analysis. However, the Court does not, for the reasons already discussed, believe that the commitment of these additional resources is an overwhelming burden.

With respect to the long-term consequences of the grant or denial of interim relief, both sides have articulated more substantial concerns, but these concerns that are necessarily infused with a substantial amount of speculation. The Union has expressed considerable concern that its majority support among employees may be eroded if it is not permitted to begin representation of and bargaining on behalf of the employees immediately. The Union ob-

serves that nearly a year has passed since its certification by the FLRA, and yet it has not been able to take any action on behalf of the bargaining unit employees; the Union further observes that if interim relief is not ordered there will be an additional perhaps lengthy delay before the employees begin to see any results of representation, during which further erosion may occur. This is a weighty concern that has been a traditional factor in courts' analysis under section 10(j) of the LMRA,[15] but one that by its very nature is impossible to quantify.

On the other side, the FDIC is concerned that it may, either through negotiation of a collective bargaining agreement or through imposition of conditions by the Federal Service Impasses Panel, become locked into a contractual relationship with the employees from which for psychological reasons it could not later retreat, despite a legal right to do so, if and when the election were set aside. This concern, however, is tempered by the fact that by the FDIC's admission it could take as long as two years to negotiate a collective bargaining agreement, and by the fact that it is unrealistic to suppose that negotiations will reach an impasse on many issues and that the Impasse Panel will then impose many conditions in the relatively brief period of time it should take the Authority to reach a final decision.

In sum, therefore, although it is not easy to tell who would be disadvantaged more—the FDIC by the grant, or the Union by the denial, of an injunction—the Court believes that the Union will be injured by a denial and that this injury is not exceeded by the harm to FDIC from granting the relief.[16]

Third, the Court agrees with the Authority and Union that there is a public interest in favor of union representation when the union has won the support of the employees in a fair election contest. The cases interpreting the LMRA make it clear that Congress considered this value to be an important one, *see International Union,* 449 F.2d at 1051, and there is no reason to believe that this interest deserves any less weight where federal employment is at issue. It is of course true that the legitimacy of the representation election is the very issue being challenged. Nevertheless, the Court's determination that there is probable cause in this case means that some weight properly ought to be given to the public interest in Union representation and bargaining.

Finally, the Court has given consideration to the notion that a substantial change in the status quo—that is, the existing state of affairs, which involves no representation or bargaining—might seem unnecessary in light of the fact that the unfair labor practice charge already has been submitted by stipulated record to the Authority, that the Authority is likely to reach a final decision within six months (allowing the Authority immediately to seek interim relief in the Court of Appeals pursuant to 5 U.S.C. § 7123(b)), and that the timing of a final decision is now under the Authority's control. Although this argument is not without force, the Court believes that it does not outweigh the alignment of considerations already described that favor injunctive relief: the existence of probable cause, reinforced by the decisions of this Circuit that illuminate the standard of re-

---

**15.** *See, e.g., International Union of Electrical Workers v. NLRB,* 426 F.2d 1243, 1249 (D.C.Cir.) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining."), *cert. denied,* 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970). Many of these cases, however, have involved ongoing employer misconduct that threatened to erode union support. Here, there is no evidence of any such misconduct, nor any hard evidence that Union support is indeed being eroded.

**16.** Given the prospect of harm on both sides and the relatively balanced equities, the Court con-

vened a separate hearing to explore the possibility of some form of "split relief" that would protect the Union's and employees' short-term interest in representation, while at the same time protecting the FDIC from immediate substantial commitment of resources. However, the parties, after a separate private discussion, concluded that such "split relief" is not feasible in this case. The Court is convinced that such relief is certainly not feasible without the parties' agreement and cooperation. Accordingly, the only alternatives are full relief or no relief at all.

view that is likely to be applied to the final decision; the absence of any significant threat to the ability of the agency to function; the Court's judgment that the traditional equities point to an injunction, although the balance may be close; and the suggestion in this Circuit's *International Union* decision that the public interest is reflected in Congress' concern that collective bargaining rights be respected where the employees have voted for union representation.

### III.  CONCLUSION

Accordingly, a separate Order is attached hereto granting the requested temporary injunction, and enjoining defendant Federal Deposit Insurance Corporation, until final resolution of the unfair labor practice charge by the Federal Labor Relations Authority, from (1) continuing to refuse to recognize the Union as the certified exclusive representative of the bargaining units hereinabove described, and (2) continuing to refuse to accord to the Union all rights and entitlements to which such exclusive bargaining representatives are entitled under the Federal Service Labor–Management Relations Act or any other applicable law. However, the relief granted in the Order will be stayed for a period of ten days from the date of the Order to allow the FDIC to appeal this decision to the Court of Appeals and to seek a stay from that Court pending its decision. In the event that such a stay by the Court of Appeals is sought within ten days of the date of this Order, the stay issued by this Court shall remain in effect until the Court of Appeals grants or denies the stay request.

### ORDER

This matter comes before the Court on plaintiff's motion for a temporary injunction. The Court has reviewed the memoranda and affidavits in support and opposition thereto, and the entire record herein. Based on the explanation, findings of fact and conclusions of law set forth in the Court's Memorandum Opinion issued on

this date, which is hereby incorporated herein, it is

ORDERED that plaintiff's motion for a temporary injunction is GRANTED; and it is further

ORDERED that, until the Federal Labor Relations Authority ("Authority") issues a final order on the unfair labor practice charge now pending before it against the Federal Deposit Insurance Corporation ("FDIC"), the FDIC is hereby enjoined from

(1) continuing to refuse to recognize the National Treasury Employees Union ("Union") as the exclusive representative of the bargaining units for which the Union was certified by the Authority on December 28, 1990, and

(2) continuing to refuse to accord to the Union all rights and entitlements to which such exclusive bargaining representatives are entitled under the Federal Service Labor–Management Relations Act or any other applicable law; and it is further

ORDERED that the relief granted in this Order is hereby STAYED for a period of ten days from the date of this Order to allow the FDIC to appeal this Order to the Court of Appeals and to seek a stay from that Court pending its decision. In the event that such a stay by the Court of Appeals is sought within ten days of the date of this Order, the stay issued by this Court shall remain in effect until the Court of Appeals grants or denies the stay request.

IT IS SO ORDERED.