NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CLAXTON MANUFACTURING
COMPANY, INC., Respondent.

No. 79–1527.

United States Court of Appeals,
Fifth Circuit.

March 21, 1980.

Elliott Moore, Deputy Associate, Gen. Counsel, Michael F. Messitte, N.L.R.B., Washington, D.C., for petitioner.

Mitchell, Clarke, Pate & Anderson, James W. Wimberly, Jr., James P. Cobb, Atlanta, Ga., for respondent.

Before GODBOLD, GEE and RUBIN, Circuit Judges.

GODBOLD, Circuit Judge:

This case concerns the requirement that as a matter of due process an evidentiary hearing must be conducted when, following a representation election, the losing party files with the National Labor Relations Board regional director evidence that prima facie raises substantial and material issues that would warrant setting aside the election.

Following a representation election that the union won,[1] Claxton Manufacturing Company filed 9 objections, supported by 20 affidavits, to conduct allegedly affecting the election results. The acting regional director conducted an administrative investigation but held no hearing. By a 22-page written report he recommended that the Board overrule the objections and certify the union. The Board adopted his findings and recommendations.

Claxton refused to bargain with the union, Laborer's International Union of North America, and refused to supply information concerning unit employees and fringe benefits and work rules. The Board brought unfair practice charges and was granted summary judgment. It seeks enforcement of its order requiring Claxton to bargain and to provide the requested information.

We decline to enforce the Board's order because of our conclusion that Claxton was entitled to a hearing on some of its objections.

The Board has wide discretion in determining whether an election has been fairly conducted, and its decisions warrant special respect on review. *E. g., Gulf Coast Automotive Warehouse Co. v. NLRB*, 588 F.2d 1096 (5th Cir. 1979); *United Steelworkers of America, AFL–CIO v. NLRB*, 496 F.2d 1342 (5th Cir. 1974). But this discretion is not unlimited. Due process requires the Board to grant "a [post-election] hearing to a losing party who has supplied prima facie evidence raising substantial and material issues that would warrant setting the election aside." *Gulf Coast, supra*, 588 F.2d at 1100; *see NLRB v. White Knight Mfg. Co.*, 474 F.2d 1064, 1068 (5th Cir. 1973); *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 32–33 (5th Cir. 1969); *U.S. Rubber Co. v. NLRB*, 373 F.2d 602, 606 (5th Cir. 1967); 29 C.F.R. § 102.-69(d) & (f). The issue of whether the employer has made an adequate showing is " 'a question of law and ultimately a question for the courts,' " *Luminator Division of Gulton Industries, Inc. v. NLRB*, 469 F.2d 1371, 1374 (5th Cir. 1972), *quoting NLRB v. Bata Shoe Co.*, 377 F.2d 821, 826 (4th Cir.), *cert. denied*, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967), but "considerable weight must be assigned to [the Board's] determinations regarding the existence or nonexistence of substantial and material

---

1. Two hundred seventy-seven votes for the union, 168 against, 12 challenged, and 1 void.

factual issues." *NLRB v. Osborn Transportation, Inc.*, 589 F.2d 1275, 1282 (5th Cir. 1979) (citations omitted); *see also NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 276–81, 94 S.Ct. 495, 498–501, 38 L.Ed.2d 495, 501–04 (1973) (effect of waiving initiation fees only for employees who signed authorization cards before election; Supreme Court majority implicitly reviewed Board's determination under question of law, not abuse of discretion, standard); K. Davis, Administrative Law of the Seventies § 30.00, pp. 689–90 (1976).

 To obtain a hearing, the losing party bears a heavy burden. Its affidavits must contain " 'specific evidence of specific events from or about specific people . . .' "; conclusory allegations are not sufficient. *NLRB v. Douglas County Electric Membership Corp.*, 358 F.2d 125, 130 (5th Cir. 1966); *see Golden Age, supra*, 415 F.2d at 33; *U.S. Rubber Co., supra*, 373 F.2d at 606. Moreover, an election may be set aside only if the objectionable activity, when considered as a whole, either tended to or did influence the outcome of the election. *NLRB v. Gulf States Canners, Inc.*, 585 F.2d 757, 759 (5th Cir. 1978); *Home Town Foods, Inc. v. NLRB*, 416 F.2d 392, 397 (5th Cir. 1969). Such a showing is particularly difficult to make where, as here, the union won by a wide margin. *NLRB v. Sumter Plywood Corp.*, 535 F.2d 917, 924 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977) (156 for-77 against); *United Steelworkers of America, supra*, 496 F.2d at 1347, 1349 (52 for-26 against). Yet we must consider the possibility that the objectionable conduct itself contributed to the margin of victory. *Id.* at 1347 n.11.

In determining whether Claxton made out a prima facie case that as a matter of due process would entitle it to a hearing, we confine our analysis to the contents of the affidavits submitted by Claxton to the acting regional director.[2] *See Home Town Foods, Inc. v. NLRB*, 379 F.2d 241, 243 (5th Cir. 1967); *U.S. Rubber Co., supra*, 373 F.2d at 606. Employers may not rely upon "the Board staff to seek out evidence that would warrant setting aside the election." *Id.* (citations omitted); *see NLRB v. Gooch Packing Co.*, 457 F.2d 361, 363 (5th Cir. 1972). We discuss in full detail, below, the contents of the affidavits that lead us to find that the employer made a prima facie showing.

 We turn then to consider the effect of an investigation made by the regional director when the objector has met his burden of coming forward and thereby has established a right to a hearing.[3] Once the right to a hearing is established, the investigation is not a substitute for it. The hearing may not be denied on the basis of new information obtained ex parte by the regional director. *See Gulf Coast, supra*, 588 F.2d at 1098–100; *Luminator Div., supra*, 469 F.2d at 1375; *NLRB v. Air Control Products of St. Petersburg, Inc.*, 335 F.2d 245, 249 (5th Cir. 1964). Moreover, the regional director must make available relevant information discovered in the course of his investigation, at least to the extent that the employer has pointed him toward it, whether it favors the successful party or the objector and regardless of whether it was referred to by the objector's affidavits or is independently turned up by the investigation. *U.S. Rubber Co., supra*, 373 F.2d at 606–07.

---

**2.** At oral argument Claxton's counsel conceded that the affidavits attached to its objections were not submitted in that form to the acting regional director. He stated, however, that the affidavits were submitted "in rough form" and that, therefore, the director had all the information contained therein. After the regional director made his recommendations, Claxton typed up these rough affidavits and attached them to its request for review by the Board. Because the Board made no point of the form

of the information supplied to it, we consider the content of the affidavits.

**3.** The duty of the regional director to make an investigation when objections are filed to an election is found in the Regulations: he must investigate where the objections involve "conduct affecting the results of the election." 29 C.F.R. § 102.69(c).

In *Golden Age*, the Board found, and this court agreed, that the employer's proffer of proof in support of its objections was "insubstantial" and that neither the affidavits nor the administrative investigation revealed any adverse effect upon the atmosphere necessary to the employees' exercise of a free choice in the election. 415 F.2d at 33. Thus, the court decided first that the events recited in the employer's affidavits did not establish the right to a hearing. It further implied that, even though the employer did not make out a prima facie case, new information turned up in the regional director's investigation could itself have triggered the right to a hearing; in that case, however, no such information was found. This second prong of the *Golden Age* discussion is consistent with the Regulations;[4] *see also U.S. Rubber Co., supra,* 373 F.2d at 606. We need not base our decision on it, however, because Claxton's affidavits were sufficient to create a right to a hearing.

Arguably, *Golden Age* can be read to imply in dictum that the Board is entitled to resolve conflicts between the objector's prima facie evidence and evidence discovered in the ex parte investigation. If such an implication is present we do not follow it, because it was unnecessary to the decision and contrary to the plain command of *U.S. Rubber* and numerous other cases cited in footnote 6 of *Golden Age.*

With these guidelines in mind, we consider what Claxton presented to the acting regional director and the effect upon that presentation of matter turned up in the ex parte investigation.

I. The contents of the employer's affidavits and the acting regional director's findings of fact

A. *Threats and acts of violence*

The employer's affidavits included statements by several employees that anti-union employees were the victims of threats and acts of violence. One anti-union employee (R. 53) stated that she received a telephone call from a stranger identifying herself as Sancha McGowan, "a representative of the union", who told the employee that she was breaking the law and that "they" were contacting Washington and would take her to court. The regional director dismissed this statement on the grounds that the union did not employ any Sancha McGowan and therefore denied knowledge of any such person and that there was no evidence that the union was aware of, ratified or condoned the call. It is obvious that the regional director secured the union denial and disclaimers in the conduct of his ex parte investigation.

Another employee stated that he had seen Raymond Kennedy standing among a large group of employees on company property and passing out union handbills. When asked to leave the premises, Kennedy shouted, "God damn it, if you are going to play dirty then we are going to play dirty too." The employee said that Kennedy was a former Claxton employee who was identified with the in-plant organizing committee (IPOC) and that he heard that Hazel said that when he was out of town the workers should see Kennedy with their problems. (R. 54.) The regional director recited this incident but did not mention that part of the statement referring to Kennedy's connection with the union.

A third employee said that when she was wearing a "Vote No" button in her hair, a union adherent threatened twice to cut the button out of her hair and once to beat up her anti-union friend (R. 55). The regional director found that the union adherent was not a member of the IPOC and, therefore, dismissed this incident. He also noted that Claxton had done nothing when the two anti-union employees had reported these events and that the employee had continued

4. "[I]f it appears to the regional director that substantial and material factual issues exist which, in the exercise of his reasonable discretion, he determines may more appropriately be resolved after a hearing, he shall issue and cause to be served on the parties a notice of hearing on said issues before a hearing officer." 29 C.F.R. § 102.69(d).

to wear her "Vote No" pin and had suffered no further threats. All these findings were based, at least in part, on information obtained in the director's ex parte investigation.

A fourth employee stated that a union adherent, who had twice tried unsuccessfully to get her to sign an authorization card, said that "if anyone tried to cross a picket line there probably would be guns and knives and that people could get hurt and have their arms broken." She said that this conversation scared her (R. 57). The regional director did not mention this affidavit in his report.

The regional director gave several reasons for rejecting all the statements about threats. He found that some of the persons making threats were not IPOC members and, in some instances, that the union did not know of these threats. Moreover, relying solely upon statements made by the union agent Hazel, the director found that IPOC members were not authorized to act as union agents and that the union did not know about their activities. These findings are based, at least in part, on information obtained in the ex parte investigation.[5]

Claxton presented to the regional director statements of several employees concerning acts of violence. One said that in May 1977 one of her car tires was slit while she was parked in Claxton's parking lot. (R. 58.) The regional director noted that, at the time of this event, the employee had signed an authorization card but had refused to wear a union button offered to her by another employee whom she would not identify but who she said was not the type to resort to violence. The latter information clearly was obtained in the ex parte investigation.

Another employee, who refused several times to participate in union activities, said that in early May, sometime between the afternoon break and closing, two tires on her car were cut in the Claxton parking lot. While she did not know who had done this, she stated that she had seen a former employee named Raymond in the parking lot as she was returning from her afternoon break. (R. 59.)[6] The regional director did not mention the latter statement.

A third employee said that, on a Thursday evening in early May, the windshield of her car was broken while it was parked in her driveway. She stated that several employees had been after her to sign an authorization card throughout much of the campaign and that the pressure had been particularly intense that week. She told others that she was so afraid that she was thinking about quitting her job and was not going to vote. (R. 60.) The regional director mentioned neither her fear nor the pressure from the union supporters.

---

**5.** During the unfair labor practices proceeding, Claxton made a motion to amend its complaint and to introduce new evidence. It recounted Hazel's testimony given in a parallel proceeding against the company and after the election investigation here involved, to the effect that he instructed IPOC members on soliciting support from other employees, designated members to act as his conduits of information and to set up meetings, and told all voting unit employees to contact IPOC members when he was out of town. The Board correctly refused to reopen the proceedings to consider whether Claxton, with the aid of Hazel's testimony, could make its prima facie showing. Even though it did not have the testimony itself at the time of the regional director's investigation, Claxton has made no showing that it could not have discovered by that time the facts to which Hazel testified. *See Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 161–62, 61 S.Ct. 908, 916–917, 85 L.Ed. 1251, 1263 (1941); *Southwestern Portland Cement Co. v. NLRB*, 407 F.2d 131, 136 (5th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969); *cf. U.S. v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978); *Luhrsen v. Vantage Steamship Corp.*, 514 F.2d 105, 106 (5th Cir. 1975). As a result, we also may not consider this new evidence.

**6.** As noted above, another affiant stated that a former Claxton employee named Raymond Kennedy who was identified with the IPOC shouted, "God damn it, if you are going to play dirty then we are going to play dirty too", in response to a request to leave the company's premises where he was handbilling. It is reasonable to infer, at least at this point, that Raymond Kennedy and the "former employee named Raymond" are the same person.

Still another employee said that his house trailer was ransacked about a week after he spoke at an anti-union meeting that he had organized. At least part of that meeting had been taped and played the following night at a union gathering. (R. 61.) While the regional director did discuss the taping of the meeting in another part of his opinion, he did not mention the possible connection between the surveillance and the violence.

Finally, another employee said that on June 14, 1977, she was answering the phone at Claxton and received an anonymous bomb threat. She stated that was the first such threat she could remember in her 11 years of employment at Claxton. (R. 62.) The regional director said that the employee immediately called her supervisors, who cleared the plant, and that police investigated the threat but made no arrests. The account of the events following the bomb threat must have been obtained in the ex parte investigation.[7]

The regional director rejected all the statements about violence on the ground that there was no basis for attributing any of them either to the union or to any employee and no evidence connecting them to the then-pending election. As we discuss below the absence of such connections is not dispositive.

## B. *Acts of intimidation and atmosphere of fear*

One union adherent said that Hazel, the union agent, asked her to tape an anti-union meeting. She took Hazel's recorder and attended and taped part of the meeting, including a speech by the mayor of the town of Claxton and statements of two anti-union employees. Hazel then picked up the tape and played it the next night at a union meeting. (R. 68.) Several employees who attended the anti-union meeting said that they neither saw the tape recorder

nor knew that the meeting was being recorded. (R. 61, 63–64.) Other employees stated that they heard that the tape had been made and played at a union meeting. (R. 53, 59–61, 63–64, 71.) About one week after the tape was played, the house of the employee who organized the anti-union meeting was ransacked.

The regional director rejected this incident on the grounds that the union adherent recorded the anti-union meeting openly and without interference while wearing a pro-union button, that there was no evidence that the union intended to record any speakers other than the mayor of Claxton, and that there was no showing that the union tried to use the tape for an illegal purpose. At least the first two of these reasons are findings of fact that at best are not supported by the employer's affidavits and must therefore be based on information obtained in the ex parte investigation.

One employee said that at one union meeting she attended Hazel read aloud a long list of employees' names, asking whether they were for or against the union and checking off the responses on the list. (R. 71.) The regional director found that this had occurred. Several other employees stated that they had heard about this oral polling. (R. 55, 60, 63, 66, 70.) One woman said that she heard that it was reported at a union meeting that she favored the Ladies' Garment Union and opposed the one involved here. (R. 72.) This was not mentioned by the regional director.

Some employees also said that they heard that the names of those who tried to withdraw their authorization cards were read aloud at union meetings. (R. 55, 59, 60.) The regional director rejected these statements, saying that he had no evidence either from the employer's affidavits or from his investigation that this actually occurred. Another employee said that she was ridiculed for trying to get back the authoriza-

---

7. On appeal Claxton argued that the union used the occasion of the bomb threat to hold a meeting. This is not mentioned either in the compa-ny's affidavits or in the regional director's report.

tion card she had signed and for refusing to wear a union button. (R. 58.) This was not mentioned by the regional director.[8]

Several employees said that knowledge of the violence and the threats had spread throughout the plant and that many other employees had said they were scared.[9] (R. 53, 55–57, 59–61, 63–65.) One employee stated that other employees refused to go to anti-union meetings for fear that their cars would be seen there (R. 64) and that others wore union buttons because they were afraid of what might happen if they took them off. (R. 61, 64.) The regional director ignored all these statements as well as what employees said they heard about other acts of intimidation in his finding that there was no atmosphere of fear surrounding the election.

### C. *Improper promises of benefits*

One employee said that in a union meeting Hazel told the workers that they would get $4.50 per hour if the union came in. (R. 66.) Three employees stated that they heard others say that Hazel had promised wages of between $3.50 and $4.50 per hour if the union won. (R. 55, 56, 63.)[10] Citing statements by Hazel and four employees, the regional director found that Hazel had said that the union had obtained wage rates of $4.00–$4.50 in the construction industry

and that while he could make no promises, the union would do all it could for them. These findings were based on the ex parte investigation.

Finally, many employees made varying statements about the issue of initiation fees, but all agreed that they heard that those who signed authorization cards before the election would not have to pay these fees. One employee said that Hazel said that those who had not signed could be made to pay the fee.[11] (R. 66.) Five employees stated that Hazel told them that those who had signed before the election would decide whether and how much initiation fees those who joined later would have to pay. (R. 67, 68.) Another employee said that Hazel announced that the entire plant would decide upon the fee for late-joiners. (R. 69.)

One employee said that she heard (although it was not clear from whom) that the post-election initiation fee would be $250 and that she and two others therefore signed authorization cards. (R. 53.) Another employee said that she heard the same information from other employees and that she and several others signed cards for that reason. (R. 58.) Five other employees said that they heard from up to 12 fellow employees that there would be a post-election initiation fee of between $225 and $250.

**8.** The regional director reported that one employee said that three IPOC members told her that she would have to join the union if it won. (R. 11–12.) He rejected this statement on the grounds that the IPOC members were not union agents and that other employees told her that Hazel expressly said that there would be no such requirement. *Cf. Golden Age, supra*, 415 F.2d at 31 (such statements tend in any event to favor the employer).

**9.** The Board's contention that the testimony regarding other employees' statements about their fear is inadmissible hearsay is without merit. Assuming the hearsay rule has any application, the statements come within the state of mind exception. Fed.R.Evid. 803(3).

**10.** The regional director reported that one employee said that Hazel told those attending a union meeting that "with a union employees would get $4.50 per hour, more vacations and

better benefits," and that the union "could get rid of certain supervisors." (R. 14–15.) The regional director did not discuss the last statement but apparently discounted it on the ground that another employee said that Hazel told the employees that "he could not promise to remove anyone but felt that the union's presence would keep supervisors from getting out of line." (R. 15.)

**11.** The regional director reported that one employee said that, in response to a question asked at a union meeting regarding whether employees would have to pay initiation fees if they joined after the election, Hazel said " 'Yes, and it is a *big yes*. That's the only way you can come into the union.' " (R. 14.) The regional director discounted this event because it was supported by only one Claxton "witness."

(R. 56, 59, 60, 63, 65.) Of these five, one employee stated that those who told her said that they heard it from the "union man" (R. 60); another said that the employees who told him were IPOC members (R. 65). Yet another employee stated that he heard that the initiation fee would be $150 and that the workers talked about this before the election (R. 70). Another employee said that he also heard other workers saying that those who joined after the election would have to pay a fee (R. 64).

The regional director rejected all the employee statements regarding initiation fees, partly on the grounds that they were not adequately supported and that the meeting in which the offensive statements were made occurred before the filing of the petition for election. He also noted that one employee said that Hazel never told the employees that there would be a post-election initiation fee of $250 and that two other employees stated that Hazel told them that the workers would decide the issue of such fees. He cited Hazel's statement that he told the employees that there would never be any initiation fees. Finally, he noted that on June 20, 1977, the union passed out a letter and handbill which said in part that "As of this day, the union guarantees there will be *no initiation fees* for the employees of Claxton Manufacturing Co., Inc." He did not, however, discuss the effect of the handbill. All this information must have been obtained in the ex parte investigation.[12]

## II. Conclusions of law

We now consider whether the events described in the employee statements presented by Claxton make out a sufficient prima facie showing. Although these occurrences necessarily have been discussed seriatim, the test, as noted above, is whether considered cumulatively they tended to interfere with the outcome of the election. *Home Town Foods, Inc., supra,* 416 F.2d at 397. Of course, actions taken or statements made by or attributable to the union are the most significant in this analysis. Indeed, as a general rule, employee actions and statements that are not attributable to the union are " 'entitled to less weight' " and cannot by themselves be used to set aside an election. *NLRB v. Southern Metal Service, Inc.,* 606 F.2d 512, 515 (5th Cir. 1979); *NLRB v. Monroe Auto Equipment Co., Hartwell Div.,* 470 F.2d 1329, 1332 (5th Cir. 1972), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973). However, such acts "will nevertheless warrant setting aside the election if [they] disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election." *Golden Age, supra,* 415 F.2d at 32 n.5; *accord, NLRB v. Heavy Lift Service, Inc.,* 607 F.2d 1121, 1123 (5th Cir. 1979); *Monroe Auto Equipment, supra,* 470 F.2d at 1332 & n.3; *Bush Hog, Inc. v. NLRB,* 420 F.2d 1266, 1269 (5th Cir. 1969). Moreover, "while an *objective* evaluation is normally the basis for determination whether interference occurred sufficient to require setting aside an election, '*subjective* evidence of fear and coercion, however, may carry the day *as well* . . . .' " *Home Town Foods, supra,* 416 F.2d at 397 (emphasis original) *quoting Home Town Foods, supra,* 379 F.2d at 244.

First, the employee statements about threats and acts of violence and intimidation are prima facie evidence of an atmosphere of fear and coercion. These occurrences, which uniformly were directed against anti-union employees, were widely discussed throughout the plant. Several employees said that they and other employees were scared.

---

**12.** The regional director also reported a threat by Hazel that pro-union employees would boycott the newspaper and any merchant in the town who opposed the union. The director found that this threat was made in an angered response to a newspaper story quoting "reliable sources" for the proposition that the plant would close down if the union won and that, in light of all the circumstances, the threat "did not exceed the bounds of ligitimate [sic] campaign propaganda." (R. 18.) Since there is no mention of this event in the employer's affidavits, we do not consider it as part of the prima facie case.

Moreover, although this was not mentioned by the regional director, there was an adequate showing that Kennedy, the former employee who made the veiled threat that the union was "going to play dirty too", was an agent of the union. His actions may therefore be attributed to the union and given more weight.

Also contributing to an atmosphere of fear was the fact that an employee's house trailer was ransacked after his speech was recorded at an anti-union meeting without the knowledge of those attending the meeting and played back at a union meeting. Others were afraid that this would happen to them if they spoke against the union. The regional director found essentially that the union had not intended to be coercive. Not only is this based on statements outside the company's affidavits but also it is irrelevant.

When considered in light of the acts and threats of violence, Hazel's oral polling of employees regarding their pro or anti-union sentiments may have been coercive. The regional director read *Springfield Discount, Inc., d/b/a J. C. Penney Food Dept.*, 195 NLRB No. 157, enf'd, 88 LRRM 2173 (7th Cir., No. 72–1612, 11/30/72), too broadly when he cited it for the proposition that a union's "polling of certain eligible voters as to how they were going to vote in the election did not warrant setting aside the election, even assuming it polled all eligible employees." The Board's decision in that case was made in the context of non-coercive pre-election polling, and is therefore inapposite here.[13]

The regional director said that there was no evidence that Hazel read aloud at union

meetings the names of those who tried to withdraw their authorization cards and therefore ignored rumors on this subject. The rumors, particularly if originated by the union or any of its agents, may have been impermissibly coercive. *Cf. Brown Steel Co.*, 230 NLRB No. 153 (1977) (union may not threaten that if it loses, it will reveal to employer names of those who signed authorization cards).

The regional director rejected the employee statements regarding increased wages on the ground that no union agent had promised these increased benefits. We reject his reasoning because his finding that Hazel had not made these promises was based upon his ex parte investigation. We, however, concur in the rejection because, under *Golden Age, supra*, 415 F.2d at 30, such promises do not violate the Act.[14]

 In addition to the prima facie showing of an atmosphere of fear and coercion, the statements in Claxton's affidavits also warrant a hearing on possible violations of *NLRB v. Savair Manufacturing Co., supra.* The Supreme Court in that case held that a union's waiver of initiation fees only for those employees who signed authorization cards before the election violates the Act. The Court said that the evil to be avoided was that a union, by waiving such fees only for those who signed cards before the election, could impermissibly "buy" support. Not only might some employees who signed cards feel morally bound to vote for the union, but the unwarranted showing of support could also be used by the union to obtain further support. As a result it is permissible for a union to waive initiation fees for or to confer any other benefit upon

---

13. We reject Claxton's contention that *Savair, supra*, requires that we ban all pre-election polling by unions because employers may not engage in such polling. *See Offner Electronics, Inc.*, 127 NLRB No. 125 (1960). Not only would this call for a major extension of *Savair*, for reasons that will be discussed below, but we also are unwilling to rule as a matter of law that union polling is always coercive, as employer polling is.

14. Contrary to Claxton's assertions, *Savair* does not mandate a different result. As discussed below, *Savair* is directed at a union's conferral of benefits only on its members or supporters to coerce others to join. Here, the union has no power in itself to confer the benefit, that is, to grant higher wages to any employees. Moreover, it did not promise that only union members would receive these increased benefits.

those who join before the election only if it does the same for those who join after the election. *See NLRB v. Con-Pac, Inc.*, 509 F.2d 270, 272–73 (5th Cir. 1975); *cf. Gulf Coast, supra*, 588 F.2d at 1099 (implying that waiver of initiation fees only for those who join before or within 30 days after election may be sufficient).

Here, one employee stated that Hazel said those employees who joined after the election could be made to pay an initiation fee. Hazel's statement, if true, clearly violated *Savair*. Moreover, even if Hazel said only that either the union members or the plant employees would decide whether those who joined after the election would have to pay initiation fees, such statements would violate the spirit, if not the letter, of *Savair*, because employees would have been forced to choose between the certainty of no initiation fee if they signed cards before the election and the risk that some or all of their fellow employees would impose such fees on late-joiners. While statements made by other employees regarding initiation fees do not themselves violate *Savair*, to the extent that the pro-union employees expressly attributed their information to Hazel, their statements were relevant in determining whether any of Hazel's announcements tended to interfere with the election.

Finally, if the union or any of its agents was responsible for the threats that the names of those employees who tried to withdraw their authorization cards would be read aloud at union meetings, those rumors would also violate the spirit of *Savair*. The fear of disclosure could have prevented some employees from withdrawing their cards, thereby generating an inflated showing of support.

### III. Conclusion

In reviewing this case we have been required to examine affidavits to see if as a matter of law they make out a prima facie case, then we have had to lay these affidavits beside the regional director's report and try to determine by a process of elimination both the content and the effect of his ex parte investigation. This kind of examination should not be required of a reviewing court. The necessity arises because, as appears from the procedure followed in this case and the Board's briefs and arguments, the Board apparently thinks that it need not weigh whether the objector makes out a prima facie case through its affidavits but may await the results of an investigation and then, by considering matter turned up by the regional director and weighing the relative factual data and even making credibility determinations, it can conclude that a hearing is not warranted. The decisions of this court do not permit such a procedure.

Since the employer made sufficient showings of an atmosphere of fear and coercion that would tend to interfere with the election and of possible *Savair* violations, a hearing was required on the employer's objections in the representation case. Because no hearing was conducted the Board improperly granted summary judgment in the unfair practice case. The petition of the Board to enforce its bargaining order is DENIED.