HICKORY SPRINGS MANUFACTURING COMPANY, Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.

No. 80–3205.

United States Court of Appeals, Fifth Circuit. Unit A

May 21, 1981.

James J. Baldwin, Charles P. Roberts, III, Greenville, S. C., for petitioner cross-respondent.

Elliott Moore, Deputy Associate Gen. Counsel, Candace M. Carroll, Ruah Donnelly Lahey, Attys., N.L.R.B., Washington, D. C., for respondent cross-petitioner.

Before BROWN, COLEMAN and GEE, Circuit Judges.

GEE, Circuit Judge:

Campaign tactics preceding a representation election held among twenty over-the-road truck drivers at the petitioning em-

ployer's Fort Smith, Arkansas, facility draw before us two interesting questions of labor law. The first concerns the effect of "sincere-money" payments exacted by the union as a precondition to its organizing effort—a sort of *Savair*-in-reverse condition.[1] The second involves the effect on the election's validity of pre-election threats of picket line violence, arguably made or adopted by the union, and of threats and misconduct by union supporters in and about the polls. The Regional Director agreed with the employer that the last of these required a hearing for resolution but overruled all its other objections. In a split decision, with two of five members dissenting, the Board overruled all of the employer's objections, rejected the Regional Director's recommendation of a hearing on the violence issue, and certified the union as bargaining representative without more ado. The employer's refusal to bargain, the Board's consequent certification and bargaining order, and the employer's petition to us constitute the procedural vehicles by which the validity of that certification and the election on which it depends are brought forward. Since, for the reasons that follow, we partly disagree with the Board's disposition, we deny enforcement, vacate the Board's order, and remand for a hearing.

### The "Sincere-Money" Payments

█ The union's campaign opened in the fall of 1977 with a meeting of fifteen or sixteen of the twenty drivers, held in a rest area near Fort Smith. Present and taking the lead there were a union business agent, Cecil Douthitt, and one of the drivers, B. J. Bramlett. After an exhortation by Mr. Bramlett and the consequent signing of union authorization cards, Mr. Douthitt took the floor and advised the assembly that before the union would go further it would be necessary for a majority of the drivers to pay a total of forty dollars each, representing one month's dues and an initiation fee.

He explained that the union set this condition because of an unsuccessful organizing campaign held three years earlier, when a large percentage of the drivers signed cards but most voted against the union. Douthitt observed that there had been a lot of laughter at the union then but that this time the union would do the laughing—all the way to the bank and regardless of the election's outcome. Seven of the drivers paid directly, and Bramlett paid for seven more who were caught short on condition that he be reimbursed next payday. The employer contends that Douthitt's action in requiring these payments interfered with the employees' freedom of choice in the election and rendered it invalid.

In support of its contention the employer advances essentially two arguments, one deriving from authority and one from logic. The authority relied on is *National Labor Relations Board v. Savair Manufacturing Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). In that case the Court invalidated an election because of a campaign maneuver of a somewhat similar type to that employed here: waiver by the union of a ten dollar initiation fee for those employees who signed union representation slips before the election but not for those who signed them thereafter.[2]

As we read its opinion, the *Savair* Court discerned one basic vice in the tactic used there and other, subsidiary faults of a lesser nature. The major vice was characterized as buying of endorsements, and the Court concluded that "the statutory policy of fair elections ... [does not permit] endorsements, whether for or against the union, to be bought and sold in this fashion." 414 U.S. at 277, 94 S.Ct. at 498. To do so, the Court observed, permits the union to paint a false pre-election picture of employee support and subjects rank and file opponents of unionization to the fear of facing a wrathful union regime should the union carry. We are unable to grasp fully the force of the Court's final observation, since it ap-

---

1. *National Labor Relations Board v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973).

2. There, as in our case, the union's winning margin was paper thin: one vote.

pears to us that the danger noted will always be present for any opponent who makes his opposition known; but except for it, we see no application of the *Savair* rationale to this case.

Here there was no vote buying, rather the contrary. Here we view not a special concession to those who endorsed the union in the course of the election campaign but rather an unusual, union-imposed obstacle to employee support of the organizing effort. Nor is any *false* depiction of employee support presented by the tactic, since support with cash as well as words is true support indeed. In short, whatever the merits or demerits of the tactic employed here, *Savair* does not condemn it.

The argument from logic is not so readily rejected. It is patently true and must be conceded straight away that the preliminary cash investment in union victory exacted by Mr. Douthitt tended to advance the moment of decision for or against unionism by the drivers who paid. This being so, the opportunities of the employer to change their views in the course of the campaign were plainly diminished and their freedom of choice at the moment of casting their ballots somewhat pre-empted.

The matter is one of degree, however, and for several reasons we do not think the interference was of the type or of the degree of severity that we need condemn. As for its type, it was entirely legitimate: no duress was involved, and the choice to put up the "sincere money" or not was a free one. Indeed, it was a lesser step than another that would also have been entirely legitimate: affiliation with the union in advance of the election by drivers who

wished to join it. What Douthitt required was no more than an early voucher of commitment to the union cause, and we know of no rule or doctrine disqualifying persons from participation in organizing campaigns or elections on the basis of their degree or timing of commitment, whether for or against the union cause.[3]

We therefore concur with the Board and the Regional Director that the sincere-money tactic, while perhaps inelegant or unwise, was not improper. The matter is otherwise, however, as to the objections based on the threats of picket-line and strike violence and on misconduct at the polls, subjects to which we now turn.

### The Threats of Violence

■ In our circuit, it is settled that when an objector such as Hickory Springs makes out a prima facie case by its affidavits the Board must grant a hearing and may not conclude that one is unwarranted by "considering matter turned up by the regional director, ... weighing the relative factual data and ... making credibility determinations." *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364, 1373 (5th Cir. 1980). Even so, "considerable weight must be assigned to [the Board's] determinations regarding the existence or nonexistence of substantial and material factual issues." *Id.* at 1365–66 (quoting *NLRB v. Osborn Transportation, Inc.*, 589 F.2d 1275, 1282 (5th Cir. 1979)). Bearing these holdings in mind, we turn to the showing here made by Hickory Springs.

As related by the Board in its opinion, 239 N.L.R.B. 641, 99 L.R.R.M. 1715 (1978):

[T]he Employer alleges that there was "[h]arassment of employees eligible to

---

**3.** Two subsidiary arguments by the employer merit brief notice. The employer attempts to make capital of the circumstance that the drivers probably—the record is not entirely clear—signed the endorsement cards before Douthitt advised them of the required payment. We see small significance in this possibility, since all it amounted to was a second opportunity to opt against support of the union by refusing to pay up.

The employer also views with alarm Bramlett's advance of "sincere money" for the seven impecunious (or reluctant) drivers at the first meeting, an advance that is said to have created an obligation to repay. Doubtless it did create at least a moral one, but it too could have been countermanded simply: "Don't put up any money for me, I want to think about it; and if you do, that's your lookout."

Unless, as the record does not indicate, Bramlett was so formidable an individual that merely to disagree with him in a matter of free choice was to risk life or limb, we fail to see how several opportunities to disagree could be more coercive than one.

vote in the representation election." The Regional Director concluded that a hearing should be held for the purpose of resolving certain of the issues raised by this objection. The Petitioner thereafter excepted to this conclusion contending that, *even if the statements testified to by employee witnesses were made and/or adopted by union officials, they did not constitute grounds for setting aside the election. We agree.*

Each of the statements alleged to have been made or adopted by union officials related to what actions the Union would take in the event of a strike. Thus, at a union meeting one employee allegedly stated that if there were a strike and anyone crossed the line, they should be "taken out and have the dog___ beat out of them." Another employee stated that, in the event of a strike, if company trucks were caught on the road, there were lots of teamsters and anyone pulling a load would find themselves in a gully. Another employee cited a particular stretch of road where this could be accomplished. It is alleged that Union Representative Cecil Douthitt was present when these statements were made but did nothing to disavow or put a stop to them. At another meeting, presided over by the president of the Local Union, an employee asked what would be done in the event of a strike. The Local's president replied that whatever would be necessary on the picket line would be done. An employee stated that anyone who crossed the line would "get it." Another employee purportedly stated that, if there was any stomping done, he would be in the middle of it. The Employer's witness said he echoed the sentiments of the last employee and added that if anyone bothered his family "that would be it." Finally, a question was raised about the nonunion firm which leased its trucks to the Employer. The witness said that the Local's president stated that "Ryder would be taken care of."

(footnotes omitted and emphasis added).

As the emphasized passage evidences, it was the conclusion of the Board majority in this case that even if the quoted threats of beatings, "stompings," and assorted mayhem were made or adopted by union officials in the course of this organizing campaign, not even a prima facie case justifying a hearing on whether the election should be set aside was made out by the employer. This is so, says the Board, because they include no specific threat directed at employees' conduct during or vote in the impending election. Since the threats were all conditioned on what the union would do in the event of a strike after winning the election, it is said, they could not have destroyed the proverbial "laboratory conditions" necessary for a valid election. Moreover, says the Board, such nasty words are likely to repel voters who, after all, need only vote against the union and so evade these threatened consequences of union victory. With all such deference to the Board's expertise in the labor field as we are often adjured to accord, we think that view myopic and far too narrow.

In the first place, we find in the record affidavits establishing, prima facie, that the Board's version of the facts is, to be kind, incomplete. These affidavits assert that B. J. Bramlett—coyly referred to as "an employee" by the director's report and as to these matters ignored entirely by the Board majority—did indeed engage in other threats than those related and in some specifically directed to the election. Mr. Bramlett was the driver who, as detailed above, exhorted the drivers at the first organizational meeting in favor of the union and advanced several hundred dollars in "sincere money" for seven drivers who could not (or would not) do so at that time themselves. In another exchange, omitted in the administrative accounts excepting for the outraged dissents of the Board minority, Bramlett advised a group of drivers awaiting a run that in the event of a strike, "there were ways to stop Hickory. You've heard about drivers being pulled out of trucks, and trucks being burned. You've heard about drivers being run off the road."

And against the background of this and other strike-related threats came election

day. Polling was at the shipping office, Bramlett was the official observer for the union. According to one affidavit, "[e]ach time the door opened and closed to let a new voter in. Each time someone would finish voting, Bramlett would holler out 'Send another one in.' The NLRB man never said anything about this." By another:

> On the day of the election there was a group gathered about 15 feet from the door to the shipping office. *Ron Jones and Joe Hill were telling everybody that was there and everybody that arrived that if they didn't vote yes they were going to get fired.* I was there the whole time and this was told to everyone that was present. After everyone voted, they came back to this group. Ron and Joe did this also, and continued to talk as they were previously.
>
> *Bramlett made the statement to most everybody in my presence that if he found out anyone voted against the union, he was going to beat their ass.*

Affidavit of Gerald W. Haney, R. 84 (emphasis added). So much for laboratory conditions.[4]

Even were the board's canvass of the record a complete one, however, and were the matter referred to above not a part of it, we could not concur in the Board's conclusions. To do so would be to issue a free license to union officials and organizers[5]—it should be recalled that the Board majority assumed in its opinion that the union made or ratified most of the above-quoted statements—to make whatever threats they wish of burnings, beatings, and suchlike to come so long as they do not relate them specifically to the campaign or election. This we decline to permit the Board to do, for such a course of action flies in the face of human experience. Men judge what others will do on given occasions by their prior actions and, less reliably, doubtless, by their statements about their intended future actions. So they assess what kind of folk they are dealing with and how those folk are likely to react if crossed. Even the implicit threat of a club or pistol on the hip, without more, may be sufficient to influence significantly the conduct of those who are cast in company with the bearer. In short, we reject the view that such pervasive threats of violence as these can be said, in effect as a matter of law, not to have created a coercive atmosphere sufficient to contaminate the election because they were merely conditional ones.[6]

It may be that at the hearing that we direct it will become apparent that the affidavits in the record before us overstate matters or even that they are not true. Other evidence may expose Bramlett's fulminations as mere puffery or establish that

---

4. The report of the Regional Director, Mr. Raymond A. Jacobson, incorrectly states that, "All of the employer witnesses testified that they had not been threatened in any way [at the election]." R. 18. It further construes and trims the affidavit of Haney in the first passage emphasized above:

> The third witness testified he heard two drivers he identified as union supporters make the statement that if the Union wasn't voted in, everybody might as well find another job, that they would all be fired. This statement was not directed at any one person, but at the group as a whole. (R. 18).

To be sure, the director's is a possible construction of the statements attributed to Jones and Hill. Another, more sinister one, exists however: that after a union victory, it would find out those who voted "No" and procure their discharge. One purpose of hearings is to resolve such ambiguities.

We find the director's "no threats" misstatement especially hard to understand, since the statement attributed to Bramlett appears immediately after those of Jones and Hill (see above), and none of them appears anywhere else in the record.

5. And presumably, since such matters are supposed to be treated evenhandedly, to employers as well.

6. Among those recounted by us in *Claxton* is a similar one:

> A fourth employee stated that a union adherent, who had twice tried unsuccessfully to get her to sign an authorization card, said that "if anyone tried to cross a picket line there probably would be guns and knives and that people could get hurt and have their arms broken." She said that this conversation scared her .... The regional director did not mention this affidavit in his report.

613 F.2d at 1368.

he was not such a surrogate for the union as he seems on the present record. These things are for the administrator. But it is not for him to deny a hearing on such a showing as was made here. We note, moreover, as we did in *Claxton*,[7] that it should not be necessary for us as a reviewing court to parse the record and determine whether, in denying a hearing, the Board has made submerged credibility choices by ignoring matter standing clear on the face of affidavits.

We DENY enforcement of the Board's order appealed from, VACATE it as to the employer's objections 2 (strike violence) and 3 (conduct of union supporters in and near polls), and REMAND for a hearing on these objections. It is so ORDERED.