**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0536n.06

Nos. 08-2360/08-2446

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 04, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MULTI-FLOW DISPENSERS OF TOLEDO, INC. d/b/a BEVERAGE DISPENSING SYSTEMS, | ) ) ) ) | ON APPEAL FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD |
| *Petitioner/Cross-Respondent,* | ) ) | |
| v. | ) ) | **O P I N I O N** |
| NATIONAL LABOR RELATIONS BOARD, | ) ) | |
| *Respondent/Cross-Petitioner.* | ) | |

**BEFORE:** **COLE and COOK, Circuit Judges; COHN, District Judge.**[*]

**COLE, Circuit Judge.** This case arises from the petition for review filed by Multi-Flow

Dispensers of Toledo, Inc. d/b/a Beverage Dispensing Systems ("Multi-Flow") and the cross-

application for enforcement of a Decision and Order ("Order") by the National Labor Relations

Board ("NLRB" or "Board") against Multi-Flow. The Order requires Multi-Flow to recognize and

bargain with International Brotherhood of Teamsters, Local No. 20 ("Local No. 20" or "Union"), as

the exclusive collective-bargaining representative following a certification election held in December

2007. Multi-Flow admits that it refused to bargain with Local No. 20, but challenges the NLRB's

certified bargaining unit determination and disputes the validity of the election. For the reasons set

forth below, we **DISMISS** Multi-Flow's petition and **GRANT** the NLRB's application for

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

enforcement.

## I. BACKGROUND

On October 9, 2007, Local No. 20 filed an election petition to represent a bargaining unit of drivers, service technicians, beer-line cleaners, floaters, and installers employed by Multi-Flow. Multi-Flow challenged the petition, arguing that the proposed bargaining unit should not include the company's drivers.

### A. Unit determination hearing

On October 22, 2007, an NLRB hearing officer held a hearing to determine the appropriate bargaining unit. The hearing established the following facts.

#### 1. *Multi-Flow and its employees*

Multi-Flow is a wholesale distributor of fountain-beverage products, including soft drinks, juices, and the gases used to dispense such beverages. While it does not sell beer, Multi-Flow performs the service of cleaning beer lines. It provides its products and services to bars, restaurants, and nightclubs in Northwest Ohio and Southeast Michigan.

Multi-Flow's general manager, along with two area managers and a warehouse manager, oversees the company's operations from Multi-Flow's Toledo, Ohio facility. There, Multi-Flow employs two installers, four service technicians, two beer-line cleaners, seven drivers, and two floaters. Each of these positions is described below:

Installers: The two installers set up the beverage equipment necessary to dispense soft drinks, beer, or liquor at a customer's place of business.

Service technicians: The four service technicians are responsible for maintaining the

beverage equipment and providing necessary repairs.

Beer-line cleaners: The two beer-line cleaners flush out customer's beer dispensing equipment as directed by state regulations.

Drivers: The seven drivers deliver soft-drink syrups, juice products, and carbon-dioxide gas to customers. Each driver is assigned to one of seven routes that make up Multi-Flow's service territory. Drivers use hand-held computers to invoice customers and manage inventory.

Floaters: The two floaters fill in as necessary to perform any of the above duties.

2.      *Hours, wages, and working conditions*

Drivers receive a weekly rate of pay, which is based on an eight-hour work day. They have a set start-time, but they have no set finish-time. A driver's work day is complete once he finishes his route and returns to the facility. The other employees in the certified unit receive an hourly wage, and are paid only for hours worked.

In addition to their base pay, all employees are eligible for commissions based on the volume of products they sell—specifically 1.75% on generic products and 0.75% on national brands. Drivers are also eligible for a "run-out" bonus of $25 per week. A driver receives this bonus if none of the customers on the driver's route need additional product before their next regularly-scheduled delivery. Drivers may also qualify for a year-end bonus based on product sales growth.

All employees wear company uniforms and are required to drive company vehicles. All employees interact with and collect money from Multi-Flow's customers. Drivers perform their routes with company trucks, and are required to have a Class C Commercial Driver's License ("CDL") with a Hazmat endorsement. The other employees drive company vans, and are not

required to have a CDL. However, those non-driver employees who do have CDLs occasionally fill in for drivers on their routes. (Twelve of the seventeen Multi-Flow employees, including drivers, have a CDL.) Similarly, drivers also perform service-technician duties for Multi-Flow customers on a weekly basis. All employees with service training, including drivers, are required, on a rotating basis to be on call to perform service work and deliver product to customers.

### 3. Management

Multi-Flow's general manager has overall responsibility for daily operations. Installers, service technicians, beer-line cleaners, and floaters report directly to the general manager. Drivers, on the other hand, report to two area managers, who report to the general manager. Area managers are responsible for assisting drivers with all aspects of customer relations and service. These managers can make recommendations to the general manager regarding disciplinary action for all employees, including non-drivers, though the general manager makes the ultimate decisions.

## B. The unit-certification decision

On November 7, 2007, the NLRB Region 8 Director issued a Decision and Direction of Election, finding that Multi-Flow's drivers shared a sufficient community of interest with the other employees to warrant their inclusion in the bargaining unit. The Regional Director determined that installers, service technicians, beer-line cleaners, floaters, and drivers comprised an appropriate unit and ordered an election.

Multi-Flow requested review of the Regional Director's decision on November 21, 2007. On December 5, 2007, the NLRB issued an Order denying Multi-Flow's request and affirming the Regional Director's decision.

**C.     The election and appeal**

The NRLB held a secret-ballot election for the certified-unit employees on December 6, 2007.  Local No. 20 prevailed by a vote of 10-7.

On December 13, 2007, Multi-Flow filed two objections to the election.  Both objections argued that the election should be overturned.  The first objection stated that an alleged Union representative spread rumors that Multi-Flow had paid an employee $3500 to vote against Local No. 20.  The second objection stated that the Union had unlawfully promised employees "that initiation fees would be reduced if [Local No. 20] won the election, although not for everyone in the bargaining unit."  (Joint Appendix, Vol. II ("JA") 41.)

On January 18, 2008, the Regional Director issued a Report on Objections.  Assuming all of Multi-Flow's allegations as true, the Regional Director determined that Multi-Flow's objections did not raise substantial and material issues of fact or law with respect to the election and were without merit.  The Director recommended to the NLRB that the objections be overruled in their entirety.

Multi-Flow petitioned NLRB for review of the Regional Director's January 18, 2008 decision.  On April 10, 2008, despite Multi-Flow's objections, the NLRB adopted the Regional Director's Report on Objections and certified Local No. 20 as the employees' exclusive bargaining representative.

**D.     Unfair labor practices proceeding**

Following the NLRB's certification decision, Local No. 20 sent Multi-Flow a letter requesting that Multi-Flow recognize its status as the exclusive bargaining representative and begin negotiations.  When Multi-Flow refused, the Union filed an unfair labor practices charge on July 23,

2008.

The NLRB's general counsel issued a Complaint and Notice of Hearing on July 31, 2008, alleging that Multi-Flow's failure to bargain violated section 8(a)(5) and (1) of the National Labor Relations Act ("Act" or "NLRA"), 29 U.S.C. § 158(a)(5), (1). On August 21, 2008, the NLRB's general counsel moved the Board for summary judgment. Multi-Flow admitted that it refused to bargain with Local No. 20, but defended by again challenging the unit-certification determination and the election.

On September 29, 2008, the NLRB granted the general counsel's motion for summary judgment, finding that Multi-Flow's refusal to bargain violated the NLRA. The Board ordered Multi-Flow to recognize and bargain with Local No. 20. Multi-Flow filed this petition for review on October 23, 2008. The NLRB later filed an application seeking enforcement of the September 29, 2008 order.

## II. DISCUSSION

**A.      The NLRB's bargaining-unit determination was not arbitrary, unreasonable, or an abuse of discretion.**

Multi-Flow petitions for review of the NLRB's decision certifying the installers, service technicians, beer-line cleaners, drivers, and floaters as an appropriate unit for bargaining under the NLRA. Multi-Flow's central argument is that its drivers do not share a sufficient community of interest with other employees in the unit. We disagree.

The NLRA provides the Board with authority to select an appropriate unit for collective bargaining. *See* 29 U.S.C. § 159(b). The appropriate unit determination "lies largely within the

discretion of the Board, whose decision, 'if not final, is rarely to be disturbed . . . .'" *S. Prairie Constr. Co. v. Operating Eng'rs, Local 627*, 425 U.S. 800, 805 (1976) (quoting *Packard Motor Co. v. NLRB*, 330 U.S. 485, 491 (1947)). In fact, the scope of this Court's review of the Board's unit determination is "exceedingly narrow," *NLRB v. Am. Seaway Foods, Inc.*, 702 F.2d 630, 632 (6th Cir. 1983) (citation omitted), and "the Board's determination must be upheld unless it is arbitrary, unreasonable, or an abuse of discretion." *David Wolcott Kendall Mem'l Sch. v. NLRB*, 866 F.2d 157, 159 (6th Cir. 1989) (citation and internal quotation marks omitted).

"Determining an appropriate bargaining unit is closely tied to the unique facts of any given case." *Bry-Fern Care Ctr. v. NLRB*, 21 F.3d 706, 709 (6th Cir. 1994). If supported by substantial evidence, factual findings made by the Board in the course of a unit determination are conclusive. *Id.* (citing *Armco, Inc. v. NLRB*, 832 F.2d 357, 362-63 (6th Cir. 1987)); *see also* 29 U.S.C. § 160(e). In making the unit determination, the Board must select an "appropriate" bargaining unit. 29 U.S.C. § 159(b). There may be a range of appropriate units, and the Board is not required to select the most appropriate unit. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 610 (1991); *see also Bry-Fern Care Ctr.*, 21 F.3d at 709. "Thus, one union might seek to represent all of the employees in a particular plant, those in a particular craft, or just a portion thereof." *Am. Hosp. Ass'n*, 499 U.S. at 610.

In evaluating the appropriateness of the Board's unit determination, "we follow the community of interests test: two groups of employees can properly be included in the same bargaining unit if they share a community of interests sufficient to justify their mutual inclusion in a single bargaining unit." *Bry-Fern Care Ctr.*, 21 F.3d at 709 (citations and internal quotation marks omitted). The community-of-interests test considers several factors: "(1) similarity in skills,

interests, duties, and working conditions; (2) functional integration of the plant, including interchange and contact among the employees; (3) the employer's organizational and supervisory structure; (4) the bargaining history; and, (5) the extent of union organization among the employees." *Armco*, 832 F.2d at 362.

The Board's finding that drivers share a sufficient community of interest with other included employees was not arbitrary, unreasonable, or an abuse of discretion and is supported by substantial evidence. While Multi-Flow has established that there are some differences in working conditions between its drivers and other employees, the evidence shows that there is a significant degree of job overlap among employees. For example, drivers regularly perform the duties of service technicians, while service technicians sometimes deliver products to customers. All employees with service training are required to share on-call duties, including going on service calls and delivering products. Moreover, installers, service technicians, and floaters all fill in for drivers as needed.

The evidence also establishes that all employees interact with customers and are responsible for maintaining company goodwill. All employees wear uniforms and are required to drive company vehicles. While drivers are paid a weekly rate and all other employees are paid on an hourly basis, all employees are eligible to earn sales commissions. In terms of management, only drivers report to the area managers, who report to the general manager. However, all employees are ultimately responsible to Multi-Flow's general manager.

In sum, the similarities in skills, interests, duties, working conditions, and supervisory structure, and the functional integration of Multi-Flow's employees demonstrate a sufficient community of interest between drivers and other employees in the unit. Multi-Flow has not

overcome its heavy burden of showing that the Board's unit determination was arbitrary, unreasonable, or an abuse of discretion. As the Board need not certify the single most appropriate unit, we conclude that the challenged bargaining unit is appropriate and affirm the Board's decision.

**B.      Pre-election conduct does not require that the election be set aside.**

Multi-Flow presents three arguments in support of its claim that the results of the election be set aside. First, Multi-Flow asserts that the Board applied the wrong standard of review in evaluating Local No. 20's pre-election conduct. Second, it argues that pre-election rumors tainted the election. Third, it contends that an offer to waive initiation fees interfered with free choice in the election. For the reasons set forth below, each argument fails.

In December 2007, the NRLB conducted a secret-ballot election at Multi-Flow. "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower*, 329, U.S. 324, 330 (1946); *see also Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 313 (6th Cir. 1987). Moreover, "[w]e give the Board broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union." *NLRB v. V&S Schuler Eng'g*, 309 F.3d 362, 372 (6th Cir. 2002) (citations and internal quotation marks omitted). We will not lightly set aside representation elections. *See NLRB v. Precision Indoor Comfort, Inc.*, 456 F.3d 636, 639 (6th Cir. 2006) (citing *Dayton Hudson Dep't Store Co. v. NLRB*, 79 F.3d 546, 550 (6th Cir. 1996)). "Thus, the burden of proof on parties seeking to have a Board-supervised election set aside is a 'heavy one.'" *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 808 (6th Cir. 1989) (quoting *Harlan #4 Coal Co. v. NLRB*, 490 F.2d

117, 120 (6th Cir. 1974)). A party seeking to overturn a representation election bears the burden of demonstrating that "unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the results of the election." *NLRB v. Shrader's Inc.*, 928 F.2d 194, 196 (6th Cir. 1991). To overturn an election "based upon the misconduct of third parties," Multi-Flow must demonstrate that the "'misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible.'" *Precision Indoor Comfort*, 456 F.3d at 639 (quoting *V&S Schuler*, 309 F.3d at 375).

### 1. Third-party standard of review is proper

Multi-Flow asserts that the Board improperly used the third-party standard of review. It asserts that Tom Rembowski, a Multi-Flow employee, acting as an agent of Local No. 20, was responsible for spreading pre-election rumors. As such, Rembowski's conduct should have been attributable to the Union. Thus, Multi-Flow asserts that the Board should have given greater weight to such conduct in evaluating its impact on the fairness of the election—specifically, reviewing his conduct for whether it reasonably tended to interfere with the employees' free and uncoerced choice.

Multi-Flow's argument fails because the record is devoid of evidence showing that Rembowski acted as a Union agent. The general rule is that a union is not responsible for the acts of an employee, unless the employee is an agent of the union. *See Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 355 (6th Cir. 1983). "The party seeking to prove that an employee is a union agent must show that the union 'instigated, authorized, solicited, ratified, condoned or adopted' the employee's actions or statements." *Id.* (quoting *NLRB v. Miramar of Cal.*, 601 F.2d 422, 425 (9th Cir. 1979) and citing *Worley Mills, Inc. v. NLRB*, 685 F.2d 362, 366 (10th Cir. 1982)). Multi-Flow has not met

that burden. We agree with the Regional Director's conclusion that there "is no evidence that the Union originated or circulated the rumor," (Report on Objections 2, JA Vol. II 53) or that it "was involved in the circulation of this rumor, nor is there any evidence the Union was aware of the rumor prior to the election." (Report on Objections 2 n.2, JA Vol. II 53.) Multi-Flow's mere assertion that Rembowski was an agent is not enough. In the absence of such evidence, the Board properly used the third-party standard of review.

2.      *Pay-off rumor spread by third party does not necessitate setting aside election*

Multi-Flow argues that a new election is required because Rembowski and other employees made a substantial misrepresentation at a time that precluded Multi-Flow from effectively replying. Specifically, it alleges that a rumor was spread that Multi-Flow had paid an employee, Paul Morris, $3500 to change his vote and to convince other employees to vote against the Union. Multi-Flow contends that the company did not have a sufficient opportunity to respond since the rumor was spread on the eve of the election. Thus, this rumor unfairly interfered with the conduct of the election, which should be set aside.

Even accepting Multi-Flow's allegations as true, the Board determined that this third-party conduct was not so egregious as to render a free election impossible. We agree with the Board that the alleged rumors did not taint the entire election. It is not unusual for propaganda to circulate during fiercely contested union campaigns, and "neither unions nor employers can [be expected to] prevent misdeeds . . . by persons over whom they have no control." *NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 870 (8th Cir. 1972) (citations omitted). At worst, the alleged conduct consisted of misrepresentations by a third party, which could easily have been weighed and evaluated by

employees.  This hardly rises to the level of conduct creating "a general atmosphere of fear and reprisal rendering a free election impossible."  *Precision Indoor Comfort*, 456 F.3d at 639.

>    3.    *Ambiguity in reduction of initiation-fees does not require a new election*

Multi-Flow also alleges that the Union promised employees that "initiation fees would be reduced if the [Union] won the election, although not for everyone in the bargaining unit."  In support of its assertion, Multi-Flow offered to produce an employee statement that a Local No. 20 organizer told employees that initiation fees would be $250 to anyone who was previously a member, but only $5 for all other employees.  It argues that the meaning of this offer to reduce initiation fees is unclear, or ambiguous.  Because of this ambiguity, it contends employees were free to attach their own meaning to the offer.  Multi-Flow alleges that one employee, Josh Pawloski, understood the Union's offer to be that initiation fees would be reduced for those who approached the Union or supported the Union prior to the election.  Multi-Flow argues that such an offer by the Union would materially interfere with free choice in the election and thus requires a new election.

In *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270 (1973), the Supreme Court held that it was impermissible for a union to offer to waive initiation fees only for those employees who manifested support for the union before the election.  The Court reasoned that permitting such a practice would allow the union "to buy endorsements and paint a false portrait of employee support during its election campaign."  *Id*. at 277.  In an unpublished opinion, *Vanden Brink Meat Co. v. NLRB*, we recognized that "[t]his prohibition against 'bought' union endorsements applies to union offers to reduce initiation fees in exchange for employee support."  831 F.2d 298, 1987 U.S. App. LEXIS 12682, at *4 (6th Cir. Oct. 9, 1987) (citing *NLRB v. Aladdin Hotel Corp.*, 584 F.2d 891 (9th

Cir. 1978)). Further, "if a union initiation fee offer is ambiguous, and one reasonable construction of that ambiguity violates *Savair*, the union must clarify its offer or the election will be set aside." *Id*. (citing *Inland Shoe Mfg. Co.*, 211 N.L.R.B. 724 (1974)).

We conclude that the purported union fee waiver in this case does not violate *Savair* and does not require a new election. The challenged statements merely demonstrate that Local No. 20 was offering to reduce initiation fees. The statements do not imply that the fee reduction was limited to employees who supported the Union, voted for the Union, or joined the Union before the election. In order to implicate *Savair*, the employee's interpretation of a union initiation fee offer must be reasonable. *See Vanden Brink Meat Co.,* 1987 U.S. App. LEXIS 12682, at *4; *see also ATR Wire & Cable Co. v. NLRB*, 752 F.2d 201, 201 (6th Cir. 1985). We believe that Pawloski's interpretation is not supported by a fair reading of the Union's offer. To the extent that Pawloski's interpretation was shaped by conversations with fellow Multi-Flow employees, these third-party statements are not attributable to the union. *See Kitchen Fresh, Inc.*, 716 F.2d at 355. There is no reason to believe that Local No. 20's initiation fee offer interfered with a the exercise of free choice.

*4.       The close outcome of this election does not compel setting aside its results*

Finally, Multi-Flow correctly points out that the closeness of a representation election is an important consideration in determining whether the misconduct at issue warrants setting it aside. *See Colquest Energy, Inc. v. NLRB*, 965 F.2d 116, 122 (6th Cir. 1992). Even so, "we must nevertheless weigh this factor in connection with the 'severity of the [alleged misconduct].'" *Precision Indoor Comfort*, 456 F.3d at 640 (citing *Colquest Energy*, 965 F.2d at 122). The closeness of a union election "does not warrant setting aside the election results where, as here, 'the company's

objections go to a handful of isolated incidents.'" *Id*. (quoting *NLRB v. Bostik Div., USM Corp.*, 517 F.2d 971, 975 & n.5 (6th Cir. 1975)). The isolated incidents raised by Multi-Flow are not so severe to give us pause in upholding the NLRB's decision in this close election.

### III. CONCLUSION

For all of the above reasons, we **DISMISS** Multi-Flow's petition for review and **GRANT** the NLRB's application for enforcement of its order.